[Civ. No. 11733. First Dist., Div. One. July 1, 1942.]

ROY KOBIDA, Respondent, v. ADOLF HINKELMANN, as Administrator, etc., Appellant.

Kenneth L. White, J. W. O'Neill and Donahue, Richards & Hamlin for Appellant.

Grennan & Ripley for Respondent.

KNIGHT, J.—Defendant appeals from a judgment in plaintiff's favor in an action to establish and have enforced against the estate of Amalia Hinkelmann, deceased, an alleged express oral trust involving personal property. The plaintiff, Roy Kobida, is the surviving son of the decedent and Joseph Kobida, who predeceased her. The mother died intestate in April, 1939, leaving surviving her as heirs at law the plaintiff, aged 42 years, another son two years younger than plaintiff, and her second husband, Adolf Hinkelmann, who was appointed administrator of her estate and is the de-

fendant herein. The complaint in the present action was filed in September, 1939, and is based on allegations to the effect that for a period of 16 years beginning in 1912 plaintiff turned over his earnings to his mother pursuant to an agreement with her that she would save and invest the money for his use and benefit and on demand return the same to him together with the earnings thereof; that the following property inventoried in her estate represented the accumulations and investments of said trust moneys: savings accounts in banks and other depositaries amounting to $7,350, of which $1,700 was in United States Postal Savings Certificates; three unsecured promissory notes of the total appraised value of $1,410; and two trust deeds securing the payment of promissory notes, one for the appraised value of $9,160 plus interest given by Godfrey and Louise Mezirka, and the other for the face value of $4,500 given by John and Theresa Weber. The answer put in issue the material allegations of the complaint and pleaded the statute of limitations. The trial court found that a trust existed as claimed by plaintiff; that plaintiff's mother at the time of her death "held certain property consisting of money and other evidences of investment in trust for the plaintiff"; that at the time of the trustee's death plaintiff was beneficiary to the extent of $6,000 and gave judgment in his favor for that amount.

Section 2221 of the Civil Code provides that ". . . a voluntary trust is created, as to the trustor and beneficiary, by any words or acts of the trustor, indicating with reasonable certainty: 1. An intention on the part of the trustor to create a trust, and 2. The subject, purpose and beneficiary of the trust." And it is well settled that such trusts must be proved by parol evidence, but that the evidence must be "clear, satisfactory and convincing." (See *Taylor* v. *Bunnell*, 211 Cal. 601 [296 Pac. 288], and 23 A. L. R., note, p. 1500.) In the case of *Lefrooth* v. *Prentice*, 202 Cal. 215 [259 Pac. 947], the term "clear and unequivocal" is used. As first ground of appeal defendant contends that the evidence in the present case does not measure up to the required legal standard. It has been held repeatedly, however, that whether the evidence in any given case is of the character mentioned must be determined by the trial court, and that where such determination is not wanting in evidentiary support a reviewing court must accept such determination as conclusive. (25 Cal. Jur. p. 248; *Taylor* v. *Bunnell, supra; Brison* v. *Brison*, 90 Cal. 323, 334 [27 Pac. 186]; *Mead* v. *Mead*, 41 Cal.

App. 280, 285 [182 Pac. 761]; *Bollinger* v. *Bollinger*, 154 Cal. 695, 703 [99 Pac. 196]; *Harris* v. *Harris*, 136 Cal. 379, 384 [69 Pac. 23].) Furthermore, it is held that in passing upon the question of whether the finding of the trial court is justified by the evidence, it is necessary to take into consideration all of the evidence, rather than certain disconnected portions thereof. (*Brison* v. *Brison, supra.*) ▮ Viewed in the light of these rules, the record in the present case shows that the trial court's findings in plaintiff's favor on all material issues are amply sustained by evidence consisting not alone of the plaintiff's testimony, but of the testimony of disinterested witnesses and strong corroborative documentary proof.

A fair picture of the background of the family may be had from the following facts, as they appear from the evidence: Plaintiff's father and mother were Czechoslovakians. In 1906 they moved from Chicago to Oakland with their two sons, Roy being then about 12 years old. Thereafter they made Oakland their permanent home. They were illiterate, hard working, thrifty people. For many years Joseph Kobida, the husband and father, worked as a mechanic for the Southern Pacific Company. He died in 1929, leaving two pieces of residential property he and his wife had acquired, and a $2,400 bank account standing in his name, all of which was turned over to her as community property. The mother was queer in some ways, but especially shrewd and thrifty. She was able to read and write very little English, but understood the value of money, and how to earn and save it. The family lived in a small home on an ordinary sized city lot, and besides doing her own housework, Mrs. Kobida found time to earn money in various ways. She did housework for other people, raised goats and sold the milk, raised chickens and sold the eggs, and made and sold wine. She also carried on a personal loan business with neighbors, for amounts ranging up to $500, at high rates of interest. She usually wore old and quaint clothing, and around her own premises frequently went barefooted. Plaintiff left school at the age of twelve. His ability to read was limited, but he was very industrious and apparently inherited his mother's propensities for hard work and frugality. Except for the time he served as an enlisted soldier overseas during the world war, he lived home almost continuously until 1928; and the evidence shows that his mother had a very deep devotion for him and that he always

had unbounded confidence in her judgment and integrity in taking care of and investing his earnings.

With respect to the matter of the creation of the trust plaintiff testified most positively that the understanding he had with his mother about the money he gave her was that she was "taking care" of his money for him, "saving" it for him; that she "invested it" for him; and told him the money would be his whenever he wanted it; that she would say, "now, this money that you are giving me, I am saving it for you and you can have it anytime you want it"; that he did not ask her at any time for the return of any of the money because he did not need it, and if he did not take it, it would come to him when she died. To quote from his testimony: ". . . it was always known that of course when I turned this money over to her, why, she would take care of it for me. Q. She was to take care of it for you and leave it to you when she died? A. No, if she died, I would expect it, yes. Q. You did not expect it before, did you? A. I didn't have occasion to expect it before. I did not have no need for it." Again, "I always expected the money when she died, but I could get it whenever I wanted it, but I had no occasion to ask for it at any time. Q. The only reason you never asked your mother for any money or for the money prior to the time of her death, was because you did not have any occasion for it and did not need it? A. I did not need it, I did not have occasion to."

In strong corroboration of plaintiff's testimony there was introduced in evidence in his behalf a bank book issued by the San Francisco Bank, showing that on January 9, 1931, she opened an account in the name of "Mally Kobida Trustee for Gejza Kobida," and deposited therein $9,346.25. "Mally Kobida" or "Molly Kobida" were the names by which she was generally known; and "Gejza" was apparently one of plaintiff's given names, and she usually referred to him as "her Gejza." Plaintiff further testified that his mother showed him bank books issued to her in her name as trustee for him, and that she told him the money deposited therein was his; that she also showed him Postal Savings Certificates amounting to $1,700, saying the money was his; and that she discussed different investments with him but used her own judgment in making them. And in further corroboration of plaintiff's testimony he produced three disinterested witnesses, all friends and neighbors of Mrs. Kobida, who testified in effect

that she had told them that she was saving plaintiff's money for him; that the money she loaned out was not only her money but her son's money. One witness testified that Mrs. Kobida had told her that Roy was a good boy to her, that he gave her all his earnings and she invested them for him; that she had $9,000 in a San Francisco bank that she wouldn't touch because it was Roy's. Another witness called by plaintiff testified that when she asked Mrs. Kobida why she was so saving, she replied that this is for her and her Gejza. She also told the witness that she went over to San Francisco because she made money for herself and her Gejza.

As to the various sums of money plaintiff turned over to his mother, his testimony was in substance as follows: He went to school about a year after they came to California. He had been working at odd jobs in Chicago, and after moving to Oakland continued to work after school and during vacations. From 1912 until he enlisted in the army in 1917 he worked at various jobs as laborer, apprentice and mechanic, earning $22 or $25 a week on some jobs, and as much as $6.40 a day with overtime on others. He lived at home all during this period, except on a couple of jobs where he lived at the job. He testified that he gave his mother all his earnings, and she gave him back what money he needed for spending money. When he worked away from home temporarily, either his board was deducted by his employer from his check, or his mother gave him the money to pay it. She bought his clothes, and once gave him about $75 to buy an automobile. While he was overseas with the army he had $15 a month (approximately half of his pay) sent to his mother, and when he received his bonus of $1,400 he turned it over to her. After the war he worked again at different places as a mechanic, earning as high as $7 a day with overtime, and continued to turn over all his wages to his mother, and she gave him back what spending money he wanted, amounting to about $3 a week. For a period of five or six months he engaged in the automobile repair business with his brother, during which time he did not give his mother any money. After this venture he went back to work as a mechanic for the Moore Shipyards, the Victory Motor Company, the Durant Motor Company and others, and again earned at times over $7 a day. Out of these earnings he gave his mother about $25 a week; but about this time concluded to go into business for himself, so he opened a savings account in his name and

in 1925 went into business for himself. However he continued to give his mother $25 a week for himself, and an additional $18 a week as salary for his father when he helped him; and he made these $25 weekly payments to her up to 1928, when he married and ceased living at home.

The trial court found that the amount due plaintiff and held in trust for him by his mother at the time of her death was $6,000; and while it does not appear just how the trial court arrived at that amount, the evidence clearly shows that $6,000 was withdrawn by her from the $9,346.25 trust account in the San Francisco Bank, and by her invested in the Mezirka loan. The circumstances relating thereto, as explained by plaintiff, were these: Early in 1939 his mother held a second mortgage on the Mezirka property, upon which there was then due $2,800. The Bank of Italy held the first mortgage, given originally to secure a loan of $10,000, which had been reduced to $6,000. The bank called the loan, and in order to protect the second mortgage plaintiff's mother acquired the first mortgage; and a new note was given to her for $9,-260, secured by a deed of trust. The trust account with the bank shows a $6,000 withdrawal on January 16, 1939, which left a balance therein of $279.17; and the new Mezirka note and trust deed bear date January 30, 1939. Plaintiff testified definitely and positively that his mother withdrew the $6,000 from the trust account for the purpose of investing the money in the Mezirka loan; that before doing so she talked the matter over with him and he advised against it; and that afterwards she told him that she had done so on the advice of Hinkelmann. The trust account further shows that previously and on July 9, 1935, plaintiff's mother withdrew $3,000 therefrom, which plaintiff testified went into the Weber loan. In this connection the evidence shows that the mortgage is dated March 23, 1936; that it was made out originally to "Molly Kobida and Roy Kobida, her son," but that sometime subsequently a line was drawn through the words "and Roy Kobida, her son." When, why or by whom this was done the evidence does not explain.

It is quite obvious that the foregoing evidence is legally sufficient to sustain the trial court's conclusion that plaintiff established all of the elements of a voluntary trust as they are specified in sections 2221 and 2222 of the Civil Code; and that at the time of the death of plaintiff's mother at least $6,000 of plaintiff's money was on deposit or invested in secur-

ities standing in her name. ■■■ Defendant argues that plaintiff's testimony was "equivocal"; and in this connection it may be conceded that on cross-examination some conflicts were developed on minor matters. But under the authorities above cited, the question of whether the evidence in any given case is "clear, satisfactory and convincing" is for the trial court to determine; and none of the points urged by defendant in this behalf would justify the rejection of the trial court's determination as being unsupported. ■■■ Defendant would have the word "unequivocal" as used in the decision in *Lefrooth* v. *Prentice, supra,* construed as meaning "without conflict"; but necessarily such narrow construction would preclude the beneficiary in all cases from obtaining relief in the trial court if the evidence presented a conflict on any point; and such is not the law. Obviously the court in the Lefrooth case intended to use the word "unequivocal" in a sense synonymous with "clear, satisfactory and convincing," the term used in the other decisions in dealing with issues of this kind. ■■■ Nor do we agree with defendant's contention that plaintiff's testimony as to "the manner in which the trust is to be performed" was irreconcilable. He testified that he could have the money any time he asked for it, and that he would receive it from his mother when she died; but one of these statements is not necessarily false, as defendant contends. It is clear from an examination of plaintiff's whole testimony that he meant he could have the money back any time he asked for it, but that if he did not need it, or did not ask for it, it would come to him on his mother's death; that he did not need the money, so let it remain in trust, knowing it would all be his when she died.

■■■ Defendant's second major point is that the findings are insufficient to support the judgment. While they are not as definite or comprehensive as they might have been, there is no such fatal defect therein as would warrant a reversal on that ground. They cover the matter of the creation of the trust, the amount of trust funds for which the trustee was responsible to plaintiff at the time of her death, and show that the full amount thereof was then on deposit in her name or invested in the securities held by her at the time of her death.

■■■ Defendant apparently takes the position that where a deceased trustee has mingled trust funds with his own and subsequently invested the mingled funds in property which is taken in his own name, the beneficiary is relegated to the

status of a general creditor who must proceed against the decedent's estate by way of filing a claim with the representative of the estate, unless he can trace the trust funds to some definite property of which the trustee died possessed. Defendant argues, therefore, that since the trial court here found that the decedent "held certain property consisting of money and other evidences of investment in trust for the plaintiff" without specifying the particular property in which the trust funds were invested, the findings are legally insufficient to support a judgment based on a trust, and that therefore plaintiff may not recover the amount of the trust funds, because admittedly he did not file a claim against the estate. In support of this position defendant quotes from and relies on the cases of *Lathrop* v. *Bamptom*, 31 Cal. 17 [89 Am. Dec. 141], and *Estate of Arms*, 186 Cal. 554 [199 Pac. 1053], also *Orcutt* v. *Gould*, 117 Cal. 315 [49 Pac. 188], which is based on the Lathrop case. However, the decisions in the Lathrop and Arms cases are extensively reviewed in the later case of *Noble* v. *Noble*, 198 Cal. 129 [243 Pac. 439, 43 A. L. R. 1235], and the decision therein is construed and approved in *Mitchell* v. *Dunn*, 211 Cal. 129 [294 Pac. 386], and in those cases it is clearly pointed out that the rule here contended for by defendant has no application where the estate of the decedent trustee is solvent. Here there is no claim made that the estate is insolvent; in fact the record shows to the contrary. Quoting from the headnotes in *Noble* v. *Noble, supra*, that case holds that "The trustee of an express trust, by the mere process of converting the *corpus* of the trust property into cash and depositing the same in his own name and to his personal credit in his bank, cannot thereby relieve himself of his duty to render an account of his trust and relegate the beneficiary to the position of a general creditor of himself or of his entirely solvent estate; and upon the death of such trustee, leaving a solvent estate with no creditors, the beneficiary is not relegated to the position of an ordinary creditor, and is not required to present a claim against the estate, but may proceed in equity against the fund of the decedent with which the trust moneys were intermingled." In reviewing the decision in that case and conforming to the doctrine laid down therein the court in *Mitchell* v. *Dunn, supra*, said: "We are aware of the rule that a *cestui* cannot follow trust funds unless he can trace them into the specific property involved. It does not suffice merely to show possession of trust funds by the trustee and the purchase of the property—it is clear that

the identity of the funds must be traced. (*Estate of Arms,* 186 Cal. 554 [199 Pac. 1053]; *Woodside* v. *Hewel,* 109 Cal. 481 [42 Pac. 152].) However, the degree of identification in an action between the *cestui* and the trustee is far less than in a case where the trustee is insolvent and the rights of creditors are involved. Whatever confusion may have existed in this regard in the decisions of this state was entirely set at rest by the case of *Noble* v. *Noble,* 198 Cal. 129 [43 A. L. R. 1235, 234 Pac. 439]. That case held that in a contest between the *cestui* and the administrator of a deceased defaulting trustee, where the trustee had commingled trust and personal funds, the *cestui* had a special lien on the entire estate of the deceased solvent trustee, even though the trust funds could not be traced into any definite property. The court very carefully distinguished the cases involving the rights of creditors, and held that a different rule applied in such cases. The rule is now settled in this state that when the money of the trustor can be traced into a particular fund, or deposit, though it be mingled with other money, the beneficiary may enforce the trust. (*Newport* v. *Hatton,* 195 Cal. 132, 150 [231 Pac. 987].) '' The law as laid down in the decisions in the two cases last quoted from is obviously here controlling.

Defendant's final contention relates to the question of the application of the doctrine of laches and the statute of limitations. The evidence shows, however, that under the terms of the trust plaintiff's mother was to hold the money and keep investing it for plaintiff until he asked for the return thereof; that if he did not ask for it before her death it would be left to him at that time. He testified that he did not ask for it during her lifetime; and she made no provision for its return to him upon her death. She died in April, 1939, and the present action was instituted the following September. Therefore there was no question of laches, and the statute of limitations did not start to run until the trust was repudiated by failure to make provision for the return of the trust funds upon her death.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.