In re CITY OF COLUMBIA FALLS, MONTANA, SPECIAL IMPROVE-MENT DISTRICT NO. 25, Debtor.

In re CITY OF COLUMBIA FALLS, MONTANA, SPECIAL IMPROVE-MENT DISTRICT NO. 26, Debtor.

In re CITY OF COLUMBIA FALLS, MONTANA, SPECIAL IMPROVE-MENT DISTRICT NO. 28, Debtor.

Bankruptcy Nos. 90–31775–9, 91–31360–9 and 91–31355–9.

United States Bankruptcy Court, D. Montana.

July 31, 1992.

Ralph B. Kirscher, Worden, Thane & Haines, Missoula, Mont., for debtors.

Bruce A. MacKenzie and Charles W. Hingle, Dorsey & Whitney, Great Falls and Billings, Mont., for D.A. Davidson & Co.

Eric F. Kaplan, Deputy City Atty., Columbia Falls, Mont., for City of Columbia Falls.

James C. Bartlett, Hash, O'Brien & Bartlett, Kalispell, Mont., for First Federal Sav. Bank of Montana.

## MEMORANDUM OF DECISION

ALFRED C. HAGAN, Chief Judge.

Prior to the submission of the debtors disclosure statement in this chapter 9 case, the parties, consisting of the debtor in each of the three cases, the applicable Special Improvement District of the City of Columbia Falls, Montana, the City of Columbia Falls, and the two primary interested parties, D.A. Davidson & Company and First Federal Savings Bank of Montana, have stipulated to submit four contested issues for decision that, the parties contend, are necessary for resolution prior to the submission of disclosure statement and plan issues.

The contested issues are:

1. Whether the City of Columbia Falls is required to pay assessments on property it owns within each of the debtor special improvement districts.

2. Whether the City of Columbia Falls is required to continue funding and loaning from the revolving fund, created under Montana Code Annotated § 7–12–4221, until the bond obligations of each of the debtor Special Improvement Districts are fully paid and discharged regardless of the term of the plan proposed by Debtor.

3. Whether the City has the authority to use special assessments collected and held in a District fund for the purpose of paying delinquent general property taxes when purchasing property pursuant to Montana Code Annotated § 15–17–317.

4. Whether the City of Columbia Falls is an "insider" for the purposes of Section 1129(a)(10) of the Code.

For purpose of the submission of these issues for stipulation of facts.

## I.

### STIPULATION OF FACTS.

A. SPECIAL IMPROVEMENT DISTRICT NOS. 25 AND 26.

In 1978, the City of Columbia Falls entered into an agreement with several developers for the annexation of a tract of land known as Dallas 5 Ltd., Phase I, Subdivision (the "Subdivision"). On November 6, 1978, the City of Columbia Falls adopted Resolution 603 creating Special Improvement Water and Sewer District No. 25 (hereinafter "SID No. 25") for the purpose of constructing sewer and water lines in the Subdivision. Subsequent to the creation of SID No. 25, the City of Columbia Falls sold the bonds to Davidson which in turn marketed the bonds to the public. The bonds were issued in the total principal amount of $260,000, with each bearer bond having a face value amount of $1,000.00, plus accruing interest at the rate of 8.4% per annum, amortized over 20 years. Interest on each bond was payable annually on January 1st of each year commencing January 1, 1980 and continuing thereafter until January 1, 1999 when the bonds would be redeemed. Davidson and First Federal now hold some of the bonds.

On June 4, 1979, the City of Columbia Falls adopted Resolution 613 creating Special Improvement District No. 26 ("SID No. 26") for the purposes of paving streets and installing curbs in the Subdivision. Subsequent to the creation of SID No. 26, the City of Columbia Falls sold the bonds to Davidson which in turn marketed the bonds to the public. The bonds were issued in the total principal amount of $230,000, with each bearer bond having a face value amount of $1,000.00, plus accruing interest at the rate of 12% per annum, amortized over 20 years. Interest on each bond was payable semi-annually on January 1st and July 1st of each year commencing January 1, 1982 and continuing thereafter until January 1, 2001 when the bonds would be redeemed. Davidson also holds some of these bonds.

On September 15, 1980, the City of Columbia Falls adopted Resolution No. 639 levying and assessing a tax upon all lots located in SID No. 25. Similarly, on August 10, 1981, the City of Columbia Falls adopted Resolution No. 675 levying and assessing a tax upon all lots located in SID No. 26. The special assessments have been pledged to the bondholders of both debtors pursuant to Resolutions Nos. 616 and 656 of the City of Columbia Falls and the terms of the bonds. Such special assessments constitute a lien on the real property in the Subdivision.

The developers of the Subdivision failed to develop and market Lots 1 through 51, except for Lots 1, 14, 41, 42 and 49 which were sold and for which assessments are being or have been paid. As a consequence of the developers failing to pay the real property taxes and assessments as due, the County Treasurer for Flathead County, Montana, struck off to the County for unpaid taxes the homeowners park and Lots 2–13, 15–40, 43–48, and 50–51 of the Subdivision.

On or about August 17, 1984, the Treasurer for Flathead County, Montana, assigned to the City of Columbia Falls, Montana, by an assignment of Tax Sale Certificate in consideration of the sum of $335,251.60, Flathead County's interest in the lots referenced above for non-payment of taxes assessed through 1983. The sum paid in August, 1984 included $249,208 of assessments, $31,214 of general property taxes and $54,829 in penalties and interest. On November 20, 1984, the City of Columbia Falls additionally paid the sum of $46,221.60 to the County for special assessments and taxes owing for the first half of 1984. The City also paid the second half of 1984 taxes totalling $4,667.15.

The City of Columbia Falls borrowed the sum of $302,573.71 from another Special Improvement District (not one of the debtor districts) with the balance of the necessary funds coming from the City treasury. Upon receipt of such monies the Flathead County Treasurer remitted the sum allocated to the delinquent assessments to the

City of Columbia Falls. The City of Columbia Falls then used such monies to repay the loan from the non-debtor Special Improvement District. The assessments were deemed paid and the lien was extinguished but the Debtor SID's did not receive the benefit of the funds. Pursuant to a judgment and decree filed February 19, 1985, in the Montana Eleventh Judicial District Court, Flathead County, Civil No. DV-84-569, and a Deed of Conveyance from the Flathead County Treasurer, dated and recorded on February 19, 1991, the City of Columbia Falls acquired title to the park and Lots 2–13, 15–40, 43–48, and 50–51, inclusive, located in the Subdivision.

After obtaining title to the lots described above, the City of Columbia Falls and Blumers Developers, Inc. ("Blumers") entered into an Agreement for the Purchase and Sale of Real Estate on June 28, 1985, wherein the City of Columbia Falls agreed to resubdivide the 46 lots remaining in the Subdivision into 65 lots under a new subdivision name, "Scenic View Subdivision." The outstanding special improvement district assessments were respread over the 65 lots.

Pursuant to the Agreement between the City and Blumers, Blumers agreed to purchase all 65 lots at $127,011.00 over three phases and assume and pay all taxes and assessments on the said property at the time Blumers exercised its option to acquire each phase. In the first phase, Blumers purchased Lots 38 through 65, inclusive, for $48,555.33 plus interest at 12% per annum pursuant to a promissory note and trust indenture dated July 26, 1985.

Blumers subsequently defaulted without exercising its second and third phase options, and the City of Columbia Falls initiated a suit for foreclosure of the note and trust indenture against Blumers and for payment of guarantees by several individuals, namely, Harold Blumer, Blanche Garrett, Timothy E. Blumer and Clayton E. Blumer. The foreclosure and guaranty suit was filed on March 11, 1989 in the Montana Eleventh Judicial District Court, Flathead County as Cause No. D–89–236(B) and is entitled "City of Columbia Falls v. Blumers Developers, Inc. aka Blumers Development Inc., Harold Blumer, Blanche Garrett, Timothy E. Blumer, Clayton E. Blumer and Silver Crest Industries, Inc." On March 14, 1991, Debtor moved this Court to modify the automatic stay so the referenced foreclosure action could proceed to trial and this Court issued an order dated March 18, 1991, modifying the stay to allow the debtor to proceed with the litigation. No trial has yet been held on the foreclosure suit or upon the counterclaim of Defendant Blumers although summary judgment was entered in favor of the City, thereby holding the individual guarantors liable under the terms of their guarantees.

Under the terms of the Agreement, the City remains the owner of Scenic View Lots 1–37 but has not paid any assessments levied for tax years 1987 (second half) to present. (To comply with the Blumer Agreement the City did pay special assessments for SID Nos. 25 and 26 in the amount of $134,649.84 on Scenic View Lots 1–37). The amount of assessments currently due on City-owned property totals $133,665.78 plus penalties and interest. The amount of general property taxes and assessments currently due on the property subject to the foreclosure litigation totals $125,110.25.

The City of Columbia Falls has loaned from the revolving fund $148,542.66 to SID No. 25 and $132,439.38 to SID No. 26.

B. SPECIAL IMPROVEMENT DISTRICT NO. 28.

On September 15, 1980, at the request of a group of developers, the City of Columbia Falls adopted Resolution 640 creating Special Improvement District No. 28 ("SID 28") for the construction of streets, sewer lines, water lines, curbs and gutters and underground utilities for property located in the Hilltop Home Subdivision more particularly identified as Lots 1, 3, 4, 5, 7, 9, 10, 47, 48, 49, 52, 119, 120, 121, 122, 123, 126, 128, 129, 130, 131, 132, 133, 134, 135, 136, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 153, 154, 155, 156, 157, 158, 159, 160, 183, 184, 185, 186

and 187. Subsequent to the creation of SID No. 28, the City of Columbia Falls sold the bonds to Davidson which in turn marketed the bonds to the public. The bonds were issued in the total principal amount of $560,000, with each bearer bond having a face value amount of $1,000, with accruing interest at the rate of 11.5% per annum, amortized over 20 years. Interest on each bond was payable semiannually on January 1st and July 1st of each year commencing January 1, 1982 and continuing thereafter until January 1, 2001, when the bonds would be redeemed. On August 10, 1981, the City of Columbia Falls adopted Resolution No. 676 levying and assessing a tax upon all lots identified above and located in SID No. 28.

The special assessments have been pledged to the bondholders of SID No. 28 pursuant to Resolution No. 661 of the City of Columbia Falls and the terms of the bonds. Such special assessments constitute a lien on the real property in the Subdivision. Davidson holds some of the bonds issued by SID No. 28.

The property was subsequently developed by a group of developers involved in the Hilltop Homes Subdivision, though the group changed through the years from 1980 through 1984. A number of Lots were sold to other developers, some of whom developed individual lots with improvements, and others who were unable to retain the property as a result of foreclosures by lenders. Of the original 53 lots affected by SID No. 28, 23 lots are in private ownership and have paid their assessments in full or are paying assessments in a timely fashion. Assessments on the remaining 30 lots are delinquent. The City of Columbia Falls has loaned to SID No. 28 from the revolving fund a total of $116,317.44. The City of Columbia Falls owns none of the lots in SID 28.

## C. THE PROPOSED PLAN.

Debtor filed this Chapter 9 case on November 30, 1990, and Debtor proposed a

Disclosure Statement and Plan of Adjustment on or about September 13, 1991 (the "Plan"). Under the proposed Plan, *inter alia*, (i) the City of Columbia Falls would pay none of the delinquent assessments on property it owns in SID Nos. 25 and 26, (ii) the City of Columbia Falls will be required to fund and loan from the revolving fund during the term of the plan, though obligations due bondholders are not fully paid, (iii) the City of Columbia Falls will use special assessments collected from each district to pay delinquent general property taxes to acquire property for the benefit of bondholders, and (iv) the City of Columbia Falls will not be treated as an "insider" for purposes of voting on the Plan. A Disclosure Statement hearing was scheduled for November 29, 1991 but, because of the basic nature of each of the proposals described above, the parties agreed the Court should decide the legal questions each proposal raises prior to approval of the Disclosure Statement.

## II.

IS THE CITY OF COLUMBIA FALLS REQUIRED TO PAY ASSESSMENTS ON PROPERTY IT OWNS WITHIN EACH OF THE DEBTOR SPECIAL IMPROVEMENT DISTRICTS?

In accordance with the stipulation of facts, the City acquired title in SID No. 25 and 26 as a result of tax foreclosures. The issue simply is whether the City, as owner of these lots, is required to pay the special improvement district assessments on those lots to which it holds title. The objecting creditors contend the City is liable for these assessments; the City argues it is not.

The property which the City owns within SID 25 & 26 is subject to assessment. *See* M.C.A. § 15–18–309 (1985) (repealed Sec. 59, Ch. 587, L.1987)[1]; M.C.A. § 15–18–

---

**1.** This statute is entitled "Effect of deed," and provides in pertinent part:

The [tax] deed issued under this or any other law of this state shall convey to the grantee the absolute title to the lands de-

scribed therein as of the date of the expiration of the period for redemption, free of all encumbrances ... except the lien for taxes which may have attached subsequent to the sale and the lien of any special, local improve-

214(1)(a)(ii) [2]. The Montana statutes, however, leave unresolved the question of the nature of the City's liability for these assessments; specifically, whether liability for the assessments attach only to the land itself, or to the City as an entity. Davidson argues the City is in fact "personally" liable for the assessments against property which it owns; however, "personal" liability exists only as a condition precedent to foreclosure.

One authority has stated: "No personal liability rests upon the owner of the property assessed, in absence of statute providing for it. While the action to enforce payment of the assessment is brought against the owner of the property as defendant, collection can be enforced only against the land, as the proceeding is actually in rem." [3] Section 7–12–4183 of the Montana Code Annotated provides: "[i]n case they [special assessments] are not paid, the whole property shall be sold in the same manner as other property is sold for taxes." [4] Montana statutes do not specifically provide for personal liability for unpaid assessments.

Moreover, the Supreme Court of Montana has held in the context of real property taxes that "[e]very piece of real estate is liable for the taxes upon it, and the owner thereof is not personally liable therefor. . . . [The defendant] had the option of allowing the taxes to remain unpaid and of losing his property on the one hand, or of paying the taxes, if he chose to do so, before delinquency, or after delinquency by way of redemption." [5] Because M.C.A. § 7–12–4183 provides that delinquent special assessments are collected in the same manner as other taxes are collected by the county

treasurer,[6] the *Calkins* holding that real property taxes are not a personal obligation must apply to special assessments as well.

Davidson argues *Calkins* is not applicable, because the owner of the property is a public entity. In support, Davidson cites *School Dist. No. 1 v. City of Helena,* 87 Mont. 300, 287 P. 164 (1930), for the proposition that the failure of a public entity to pay special assessments on its property may subject the entity to liability for penalties and interest. The rationale of that holding was, however, since public property was subject to assessment the same as private property, it should be subject to penalties the same as private property unless the legislature declared otherwise.[7] But the *School District* case, in contrast to Davidson's assertion, suggests compelling reasons are necessary before property owned by public entities will be treated differently from private property.

Davidson attempts to argue such circumstances exist here; that public property cannot be sold for delinquent assessments, and thus the City should be held "personally" liable in order to provide a remedy for the bondholders. While the cases do contain language that might suggest such a result, the better reading of such cases is "public property" must be property utilized for a public purpose for the restriction on foreclosure to apply. In McQuillen on Municipal Corporations the author states a judgment may be had against a public body controlling property because "property in public use cannot be sold for delinquent assessments." [8]

---

ment, irrigation, and drainage assessments levied against the property, payable after the execution of said deed. . . .
M.C.A. § 15–18–309.

2. Substantially similar statute enacted by Sec. 23, Ch. 587, L. 1987.

3. McQuillen, Municipal Corporations § 38.323, at 820 (3d ed. 1987).

4. M.C.A. § 7–12–4183(2)(b).

5. *Calkins v. Smith,* 106 Mont. 453, 78 P.2d 74 (1938).

6. Section 7–12–4183 provides that "[t]he county treasurer must collect the delinquent special assessments and taxes in the same manner and at the same time as taxes for general, municipal, and administrative purposes are collected by him." M.C.A. § 7–12–4183(2)(b).

7. *Id.* 287 P. at 166.

8. McQuillen, Municipal Corporations § 38.255 (3d ed. 1987).

In *City of Kalispell v. School District No. 5*, 45 Mont. 221, 122 P. 742 (1912), the Supreme Court of Montana stated:

> The state may, if it so elects, permit a lien to be imposed upon property devoted exclusively to public use; but the validity of the assessment does not depend upon the means by which the payment is to be enforced, and if the assessment is valid, and the proceeding by foreclosure of the lien is not available, *because of the character of the property*, the right will not fail because of failure of a specific remedy....

122 P. at 744 (emphasis added).[9]

While Montana law thus recognizes remedies other than foreclosure of the lien as available against lands "devoted exclusively to public use," it qualifies such by stating foreclosure must not be available "because of the character of the property." There is nothing in the record before this Court to indicate the property at issue here is devoted exclusively to public use, or that foreclosure is unavailable by virtue of the character of the property (*e.g.*, that it contains a city hall, school, or government office space). In fact, there appears to be nothing "public" about the property at all, other than its owner. The ultimate result of Davidson's argument would be to impose personal liability merely because the owner is a municipality. There is no justification for treating property owned by a municipality differently from that owned by a private individual, unless the municipality utilizes the property in a manner that would not permit foreclosure.

Davidson's final argument rests upon the provisions of M.C.A. § 7–6–4221, which requires the mayor of a municipality to submit a detailed estimate of the amount of funds to be appropriated from the municipality's funds to pay the municipality's portion of the improvements in special improvement districts.[10] However, this estimate is not binding on the city council.[11] The statute does not appear to indicate a legislative requirement that assessments on the property of a municipality become a charge against the City's general fund.

It is therefore concluded the City is not required to pay assessments on property it owns within each of the debtor Special Improvement Districts. Because of the grounds of this holding, it is unnecessary to reach the issue of whether M.C.A. § 15–17–320, enacted in 1987 (Sec. 12, Ch. 617, L.1987) is applicable to this case.

### III.

WHETHER THE CITY OF COLUMBIA FALLS IS REQUIRED TO CONTINUE FUNDING AND LOANING FROM THE REVOLVING FUND, CREATED UNDER M.C.A. § 7–12–4221, UNTIL THE BOND OBLIGATIONS OF EACH OF THE DEBTOR SPECIAL IMPROVEMENT DISTRICTS ARE FULLY PAID AND DISCHARGED REGARDLESS OF THE TERM OF THE PLAN PROPOSED BY DEBTOR.

The first issue is whether state law requires the City to continue loaning money from the revolving fund to the district fund until the bonds are paid in their entirety;

---

9. *See also Toole County Irrigation Dist. v. State*, 104 Mont. 420, 67 P.2d 989, 993 (1937) (state argued that assessment against state property was invalid, because property could not be sold to satisfy lien; the court rejected this argument on the basis of *Kalispell*, holding that an adequate remedy could be fashioned for nonpayment even if the character of the property prevented its foreclosure).

10. This provision states in relevant part:
The mayor of the municipality shall submit to the clerk a detailed estimate showing the amount to be appropriated from funds belonging to the municipality to defray the municipality's portion of the cost of making improvements in special improvement districts....
M.C.A. § 7–6–4221(2)(b).

11. Under M.C.A. § 7–6–4224, the clerk of the city uses the information provided by the mayor and others to prepare an estimate of expenditures and revenues. This tabulation is submitted to the city council. M.C.A. § 7–6–4226(1). "Upon receipt thereof, the council shall immediately consider the same in detail and shall, on or before July 25, make any revisions, reductions, additions, or changes therein that they deem advisable." M.C.A. § 7–6–4226(2). The tabulation, as amended by the council, becomes the preliminary budget. *Id.*

the second is whether bankruptcy law may alter such an obligation if it exists.

## A. THE CITY IS REQUIRED UNDER STATE LAW TO CONTINUE FUNDING AND OPERATING THE REVOLVING FUND SO LONG AS BONDS AND INTEREST REMAIN UNPAID.

■ The special improvement district revolving fund ("revolving fund") is authorized by the provisions of M.C.A. § 7–12–4221.[12] The purpose of this fund is "to secure prompt payment of any special improvement district bonds." M.C.A. § 7–12–4221. The revolving fund is required to continue to exist and operate until all of the bonds secured by it are fully paid and discharged.[13] Whenever either principal or interest payments on SID bonds is due, and the district fund into which the special assessments are paid does not contain enough money to make these payments, then "an amount sufficient to make up the deficiency may, by order of the council, be loaned by the revolving fund to such district fund." M.C.A. § 7–12–4223.[14] While this section provides that the council "may" order the revolving fund to loan money to the district fund, the Montana Supreme Court has held the council has no discretion

not to make such loans.[15] Where such a loan is made, the revolving fund obtains a lien against all unpaid assessments and other monies coming into the district fund. M.C.A. § 7–12–4224.

Funds for the revolving fund may be provided from two sources: (1) by loan of funds from the municipality's general fund to the revolving fund, and (2) by including in the cost of the improvements up to 5% of the principal amount of the bonds, which amount is deposited into the revolving fund. M.C.A. § 7–12–4222(1)(a)(i) & (ii). In addition to these sources of revenue, the city is required to levy a tax on all taxable property in the city "as shall be necessary to meet the financial requirements of such fund." [16] This tax may not be levied if the revolving fund contains funds exceeding 5% of the principal on the then-outstanding special improvement district bonds secured by the fund, nor may the tax if levied cause the revolving fund to exceed this 5% limitation.[17]

The City argues the purpose of the revolving fund is merely to insure *prompt* payment of principal and interest on the bonds, based on the language of M.C.A. § 7–12–4221. The fact the funds from the revolving fund are merely loaned to the district fund with a lien being taken

**12.** At the time in which the Debtor SID's were created, section 7–12–4221 provided in pertinent part as follows:

The council or commission of any city or town which has heretofore created or may hereafter create any special improvement district or districts for any purpose ... shall as to such district or districts created after February 25, 1929, create, establish, and maintain by ordinance a fund to be known and designated as the special improvement district revolving fund in order to secure prompt payment of any special improvement district bonds ... issued in payment of improvements made therein and the interest thereon as it becomes due.

M.C.A. § 7–12–4221. In 1983, this section was amended to make the establishment of a revolving fund discretionary with the city. *See* Sec. 6, Ch. 422, L. 1983.

**13.** The 1983 amendments to M.C.A. § 7–12–4221 added the language that "[n]othing herein shall authorize or permit the elimination of a revolving fund until all bonds and warrants secured thereby and interest thereon have been fully paid and discharged."

**14.** The relevant text of this statute reads as follows:

Whenever any special improvement district bond ... which [is] secured by the revolving fund or any interest thereon shall be due and payable and there shall then be either no money or not sufficient money in the appropriate district fund with which to pay the same, an amount sufficient to make up the deficiency may, by order of the council, be loaned by the revolving fund to such district fund. Thereupon, such bond ... or such interest thereon shall be paid from the money so loaned or from the money so loaned when added to such insufficient amount, as the case may require.

M.C.A. § 7–12–4223.

**15.** *Hansen v. City of Havre,* 112 Mont. 207, 114 P.2d 1053, 1059 (1941).

**16.** M.C.A. § 7–12–4222(1)(b).

**17.** *Id.*

against unpaid assessments, argues the City, shows the purpose of the revolving fund is merely to provide a temporary shelter for the bondholders. As a result, the City contends the purpose of the revolving fund statutes would be violated if the City were required under state law to continue to fund the revolving fund through taxation and to loan these proceeds to the district fund, when there was no real possibility of repayment.

It is concluded the City is required, under Montana law, to continue the revolving fund activities so long as SID Bonds and interest remain unpaid. The statutes creating the revolving fund contain a clear legislative statement the fund must continue to operate until all of the bonds and interest are "fully paid and discharged." M.C.A. § 7-12-4221. By failing to include an exception, the language of the statute requires that the fund continue regardless of whether loans from the revolving fund to the district fund become the sole source of repayment of the bond obligations.

Further, the statutory language requiring the revolving fund to secure "prompt payment" does not support an interpretation of excluding payments which were never made at all because of deficiencies in the district fund. See M.C.A. § 7-12-4221. The mere fact loans from the revolving fund are secured with a lien on unpaid assessments does not mean the lien actually has to have value. Indeed, in creating the revolving fund requirement the Montana Legislature

> but modified the special improvement district law to impose upon the general public, within the municipality, a conditional obligation to pay a small portion of the cost of erecting the public improvement, whereas it might have, lawfully, imposed a much greater burden upon the municipality.[18]

The debtors rely on language in *State ex rel. Central Auxiliary Corp. v. Rorabeck,* 111 Mont. 320, 108 P.2d 601, 604 (1941), to the effect the fund should be applied pro rata to bonds where the taxing power is exhausted and it is reasonably certain the fund will be insufficient, even though additional monies may come into the fund. This case is distinguishable. *Rorabeck* dealt with an irrigation district, which was restricted solely to either assessments or sale of the properties for delinquency of assessments to provide funds for payments to the bondholders.[19]

The City further argues the revolving fund is not chargeable with the payment of the bonds, based on the statement in *City of Havre, supra,* 114 P.2d at 1056, that bonds are debts of the special improvement district, not the city, and are payable only from the special improvement district fund. In *City of Havre,* the court addressed whether the revolving fund statutes violated a provision of the Montana Constitution restricting the amount of debt a city could incur. The court concluded loans from the revolving fund secured by a lien upon unpaid assessments were not debt; the bonds were the debt of the SID, and were payable only from the district fund. 114 P.2d at 1056-57. This addresses the responsibility of the district fund for payment of the bondholders, but not the statutory responsibility of the revolving fund to provide loans where the district fund is deficient.

Montana law thus requires the City to continue to fund the revolving fund and make loans to the district fund. However, this does not address the question of whether the provisions of Chapter 9 of Title 11 of the United States Code will supersede state law and alter the requirement the City continue to operate and fund the revolving fund. It is concluded bankruptcy law does so supersede these requirements of state law.

---

18. *Stanley v. Jeffries,* 86 Mont. 114, 284 P. 134, 138-39 (1929) (holding that the provision creating the revolving fund did not unconstitutionally benefit private persons, *i.e.,* the bondholders, but rather was for a public purpose). *See also* 42 Op. Atty. Gen. 82, at 4 (1988).

19. *See* 108 P.2d at 603, 605 (bonds payable out of a particular fund exclusively; similar to the case of special assessments where "the full taxing power of the municipality is not available for the liquidation of the bonds").

B. FEDERAL BANKRUPTCY LAW OPERATES TO TERMINATE THE REQUIREMENT THAT THE CITY CONTINUE TO OPERATE THE REVOLVING FUND BEYOND THE DISCHARGE OF THE DEBTOR SPECIAL IMPROVEMENT DISTRICTS.

1. Federal Bankruptcy Law Permits the Debtor SID's to Modify the Terms of the Bonds.

 In order to answer this issue, the question of the ability of the debtor SID's to modify or extinguish their obligations on the bonds, as opposed to the ability of the City to effect such a modification, must be answered. In general, the confirmation of a plan combined with certain other events discharges the debtor from all debts. 11 U.S.C. § 944(b).

But, Davidson argues, 11 U.S.C. § 903 limits the scope of this discharge, as well as the ability of the debtor to modify its bond obligations under the plan.[20] If the provisions of Chapter 9, Title 11, U.S.C. relieve either the debtors or the City from the revolving fund obligations imposed by state statute, Davidson argues, it would constitute an unconstitutional interference with state powers under the tenth amendment of the U.S. Constitution, citing *Ashton v. Cameron County Water Improvement Dist.*, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936).

*Ashton* invalidated Chapter IX of the Bankruptcy Act and is not controlling on the law at issue here. *See* 4 Lawrence P. King, Collier on Bankruptcy ¶ 900.01[2] (15th ed.1991). In 1937, Congress enacted then-Chapter X, which was also directed toward municipal bankruptcies. *Id.* The Supreme Court upheld Chapter X as constitutional in *United States v. Bekins*, 304

U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1937). The Court agreed with the statement of the House Committee on the Judiciary that " '[t]he Committee on the Judiciary is not unmindful of the sweeping character of the holding of the Supreme Court above referred to [in the *Ashton* case], and believes that H.R. 5969 is not invalid or contrary to the reasoning of the majority opinion.' " *Bekins*, 304 U.S. at 50–51, 58 S.Ct. at 815 (quoting H.Rep. No. 517, 75th Cong., 1st Sess.). It was this legislation that is the predecessor to today's Chapter 9. *See* 4 Collier on Bankruptcy ¶ 900.01.

The language of 11 U.S.C. § 903 does not prevent the obligations to the bondholders from being impaired in bankruptcy. Section 903 provides Chapter 9 cannot "impair the power of a State to control, by legislation or otherwise, a municipality."[21] However, no municipality may seek the protection of the federal bankruptcy laws without statutory authorization by the state. 11 U.S.C. § 109(c)(2).[22] The Montana statute permitting municipalities to file under Chapter 9 is M.C.A. § 7-7-4111, which provides:

> Any city or town may submit itself and a proposed plan of composition to the jurisdiction of the bankruptcy court having jurisdiction of such matter and be governed by the proceedings, orders, and decrees of the court as provided by the federal municipal bankruptcy laws.

M.C.A. § 7-7-4111(1).

Had the Montana Legislature sought to require municipalities to pay all of their debts in full, regardless of the cost to city services, it could have merely refused to permit municipalities to file Chapter 9 petitions by not enacting the enabling legisla-

---

**20.** In its relevant portion, section 903 provides:

This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of political or governmental powers of such municipality, including expenditures for such exercise....

11 U.S.C. § 903.

**21.** 11 U.S.C. § 903.

**22.** The relevant portion of section 109 provides as follows:

(c) An entity may be a debtor under chapter 9 of this title if and only if such entity—
* * * * * *
(2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter....

11 U.S.C. § 109(c)(2).

tion required by Section 109(c)(2). As has been well stated:

> If a municipality were required to pay prepetition bondholders the full amount of their claim with interest as contained on the face of the bonds and the SID had no ability to impair the bondholder claims over objection, the whole purpose and structure of Chapter 9 would be of little value. State law already requires full payment of the bonds issued prepetition and the state and the municipality are forbidden the opportunity to compromise the amounts due, without 100 percent consent of the bondholders. To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result.[23]

And, as the United States Supreme Court has said:

> The natural and reasonable remedy through composition of the debts of the district was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation. The bankruptcy power is competent to give relief to debtors in such a plight and, if there is any obstacle to its exercise in the case of the districts organized under state law it lies in the right of the State to oppose federal interference.[24]

Far from interfering with the ability of the state of Montana to control its municipalities, it is concluded Montana has affirmed that its municipalities may avail themselves of the benefits of the federal bankruptcy process, including the modification and termination of these sorts of debts, and such does not interfere with the power of the State of Montana to control a municipality or in the exercise of the political or governmental powers of such municipality. Reference is made on this subject to a prior memorandum of decision in this case dated June 11, 1991.

Similarly, Section 943(b)(4) does not prevent the debtors from proposing a plan that impairs the rights of the bondholders.[25] This provision applies to postpetition actions after confirmation of the plan; a city may not, for example, issue bonds as part of a plan that will not conform to all state law requirements for such bonds. *Sanitary & Improvement Dist., supra,* 98 B.R. at 974–75 (holding that bonds to be issued as part of a plan were violative of state law, and hence not permitted under 943(b)(4)). It does not, however, restrict the ability of the debtor to impair prepetition bonds so long as the other requirements of Chapter 9 are met.[26] Section 943(b)(4) thus would not bar impairment of the bonds.

2. **Discharge of the Debtor SID's Will Discharge the City From Its Obligation to Continue the Revolving Fund.**

█ While the debtors may thus modify their obligations under the bonds, and obtain a discharge as to those obligations, Davidson has noted there are two classes of entities in the case at bar: the City, and the debtor Special Improvement Districts. Davidson argues the City itself is not a Chapter 9 debtor and should not be entitled to the protections of Chapter 9. This would indeed be the case, were the City a guarantor of the bonds at issue through the mechanism of the revolving fund.

---

**23.** *In re Sanitary & Improvement Dist., No. 7,* 98 B.R. 970, 974 (Bankr.D.Neb.1989) (holding that plan of reorganization that did not recognize a state priority of bondholders before warrant-holders, and which impaired the rights of bond-holders, was permitted under Chapter 9).

**24.** *Bekins, supra,* 304 U.S. at 54, 58 S.Ct. at 816 (holding that predecessor to Chapter 9 was not invalid as a restriction on state sovereignty).

**25.** Section 943 provides that a plan under Chapter 9 shall be confirmed if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).

**26.** *Id.* at 973–75 (holding that debtor may modify bondholder rights and issue postpetition bonds with different face amounts, interest, and payment periods than the prepetition bonds, but that postpetition bonds must conform to all state law requirements).

While in some sense the revolving fund does secure payment of the bonds, case law indicates only the district fund is chargeable with the debt. The Supreme Court of Montana has said:

> It should be pointed out that the proposed bonds are not obligations of the city, but of the special improvement district only, and payable only from the district fund. The revolving fund arrangement is merely a means whereby the district may borrow money to make up any deficiency.[27]

The City is charged by statute with the responsibility to establish and fund the revolving fund for the purpose of making loans to cover deficiencies in the district fund. The revolving fund is not, however, a guarantor of the debts of the revolving fund in the sense that it may become primarily liable to the bondholders for their debt. As a result, the requirement that the City continue to fund the revolving fund and loan such proceeds to the district fund is contingent upon the liability of the district fund to make payments on the bonds. *See City of Havre, supra,* 114 P.2d at 1056. Discharge of the debtor SID districts from liability for the bonds would therefore terminate the obligation of the City to operate the revolving fund to cover deficiencies in the district funds of those debtors.

## C. CONCLUSION.

This holding on the second issue may be summarized as follows. First, under Montana law the City is required to continue to fund the revolving fund, and to loan these proceeds to the debtor district funds, for so long as any bonds or interest remain outstanding. Second, in filing for protection under Chapter 9 of the Bankruptcy Code, the debtor SID's may modify the terms of the prepetition bonds, without regard to these provisions of Montana state law. Third, the discharge of the debtor SID's from liability for the bonds would relieve the City of its obligation to fund and maintain the revolving fund insofar as it is required to do so for bonds of the debtor SID's.

## IV.

WHETHER THE CITY HAS AUTHORITY TO USE SPECIAL ASSESSMENTS COLLECTED AND HELD IN A DISTRICT FUND FOR THE PURPOSE OF PAYING DELINQUENT GENERAL PROPERTY TAXES WHEN PURCHASING PROPERTY PURSUANT TO M.C.A. § 15–17–317.

■ Section 15–17–317 allows a city to purchase property struck off to the county for delinquent property taxes and assessments by paying to the county the amount of the delinquent general property taxes.[28] The debtors and the City seek to use funds, currently held by the debtor SID funds, to pay the delinquent property taxes on properties within the SID district, thus acquiring the properties for the purpose of sale.

The debtors concede there is no statute directly on point. Debtors make essentially two arguments in favor of such authority to use district funds. First, they point to a provision of the Montana Code, section 7–12–4227(2), which permits a municipality to use any excess funds in the revolving fund to purchase property sold for delin-

---

**27.** *City of Havre, supra,* 114 P.2d at 1056 (concluding that the revolving fund did not violate constitutional limitations on the indebtedness of municipalities). *See also State ex rel. Griffith v. City of Shelby,* 107 Mont. 571, 87 P.2d 183, 185 (1939) ("It is well settled that special improvement district bonds are not general obligations of the city, and that their payment is strictly limited to the fund provided by the statutes and the city ordinances adopted thereunder"); 42 Op. Att'y Gen. 82, at 4 (1988).

**28.** The pertinent portion of section 15–17–317 provides:

> Whenever property has been struck off to the county at a tax sale under 15–17–214, is subject to the lien of delinquent special assessments, and has not been assigned under 15–17–214 or 15–17–323, at the request of the municipality the county treasurer shall assign all of the rights of the county acquired therein at the sale to the municipality upon payment of any delinquent taxes (excluding assessments) and costs, without penalty or interest.... Property sold to the municipality must be held in trust by the municipality for the improvement fund into which the delinquent special assessments are payable.
> M.C.A. § 15–17–317.

quent taxes or assessments.[29] This, they contend, shows that excess funds can be used to pay delinquent general property taxes. Second, debtors argue the Municipal Budget Law, M.C.A. §§ 7–6–4201 *et seq.*, prevents a municipality from using monies from its general fund to pay delinquent property taxes; the funds for such a purpose must come from the district fund. Third, debtors argue M.C.A. § 7–12–4191 supports their contention the City has authority to use SID funds for this purpose.

But the funds are trust funds under state law. In *State ex rel. Clark v. Bailey*, 99 Mont. 484, 44 P.2d 740 (1935), a former city treasurer had embezzled $2,000 from a special improvement district fund. A bondholder of the SID filed suit, seeking a writ of mandamus ordering the current city treasurer to redeem the bonds. The court found the city was liable to the bondholder for the misappropriated funds. In the words of the Montana Supreme Court:

> A fund that is derived from a special levy or one created for a specific purpose is in the hands of municipal officials in trust. The municipality is merely a custodian, and its duties relative to such funds are purely ministerial. *It may not use or divert them.*

44 P.2d at 746 (emphasis added).[30] *See also State ex rel. Central Auxiliary Corp. v. Rorabeck*, 111 Mont. 320, 108 P.2d 601, 603 (1941) (officers of irrigation district responsible for levy and collection of tax sufficient to pay principal and interest on bonds of district, as well as county treasurer who is custodian of those funds, are

trustees for district bondholders); *Blackford v. City of Libby*, 103 Mont. 272, 62 P.2d 216, 217–18 (1936) (city becomes trustee on behalf of warrantholders of special improvement district); McQuillen, Municipal Corporations § 43.132, at 842–43 (3d ed.1987).

Purchase by the City of the properties involved here would violate the trust for several reasons. First, such a purchase would involve use of trust assets for a purpose other than the payment of principal and interest on the bonds as they become due. This is inconsistent with the role of the municipality as a custodian, with purely ministerial powers. Second, such a purchase would convert liquid trust assets to illiquid real property, with a consequently harmful effect on the trust *res*. This is particularly so in light of the fact no purchasers were found at the initial offering of the properties for sale due to delinquent taxes. Third, the lack of purchasers suggests the real property the City proposes to acquire might well be worth less than the trust funds expended to pay the delinquent general property taxes. In light of these considerations, it is concluded the debtors cannot use SID funds for the purpose of purchasing property pursuant to section 15–17–317 under Montana law.

Further, there is no indication the Montana Legislature intended for a city to be authorized to use SID funds in order to purchase properties. Section 7–12–4227(2), relied upon by debtors, merely permits excess monies in the revolving fund to be

**29.** Section 7–12–4227 provides in its relevant portion:

> Whenever there is an amount in the revolving fund in excess of the amount deposited in the revolving fund under 7–12–4169(2) and in excess of 5% of the outstanding special improvement district bonds and warrants and the council considers any part of the excess to be greater than the amount necessary for payment or redemption of maturing bonds or warrants secured thereby or interest thereon, the council may:
>
> \* \* \* \* \* \*
>
> (2) use the excess that is greater than the amount necessary for the payment or redemption of maturing bonds or warrants secured thereby or interest thereon or any part there-

of for the purchase of property at sales for delinquent taxes or assessments, or both, or property which may have been struck off or sold to the county for delinquent taxes or assessments, or both, and against which property there then be any unpaid assessment for special improvements on account whereof there are outstanding special improvement district bonds or warrants of the city or town. M.C.A. § 7–12–4227(2).

**30.** Because the general fund of the municipality was insufficient to pay the amount due the bondholder, and the other funds controlled by the city were likewise held in trust on behalf of other districts, the court concluded that mandamus was not a proper remedy. 44 P.2d at 746–47.

used for such purchases, including those contemplated in section 15–17–317; it nowhere indicates a legislative intent to permit the use of SID funds for such purposes, nor for that matter to permit the use of revolving fund monies where no excess exists.

Debtors' reasoning regarding its reading of the Montana Municipal Budget Law appears to be as follows. (1) A municipality may purchase property held by the county for delinquent taxes pursuant to section 15–17–317. (2) Payment for such property must come from either the city's general fund or the district fund. (3) The Municipal Budget Law, and case law holding that the bonds are not general obligations of the city, prevent the city from using general funds to purchase such property. (4) Therefore, unless a city may use district funds for such purchase of the property, it will be unable to make such a purchase, and section 15–17–317 would thus be a meaningless statute.

But, section 15–17–317 is not ineffectual; as discussed *supra*, the Montana Legislature has provided that excess monies in the revolving fund may be used for such a purchase. *See* M.C.A. § 7–12–4227(2). There is, therefore, a source of funds for a city to purchase property pursuant to 15–17–317 that is neither the general fund nor the SID fund; consequently, the second proposition of debtors' argument is not correct. Even assuming the debtors are correct in their contention monies from the City's general fund cannot be applied toward the purchase from the county, such would not require the use of district funds in order to give section 15–17–317 meaning.[31]

31. The question of whether the City may, should it decide to do so, appropriate funds from its general fund for the purpose of purchasing property from the county on behalf of the debtor SID's is not considered. This issue is not before the Court, and there is no need to reach it at this point in the proceedings. Moreover, counsel for the City has represented the City will not use its general funds for such purpose, if SID funds may not be so used.

32. Section 7–12–4191 states:

Debtors present an argument based upon M.C.A. § 7–12–4191, which states the special assessments levied against a property, together with any amounts added for delinquency and for costs of collection, constitute a lien against the property.[32] Debtors argue, since advertising costs were held collectible under this statute in *School Dist. No. 1 v. City of Helena*, 87 Mont. 300, 287 P. 164, 166 (1930), the City should be allowed to use SID funds for the purchase of property for sale under 15–17–317. But the fact an assessed property owner who fails to pay his assessments may be subject to charges for delinquency and costs of collection, and that these charges constitute a lien against the property, has nothing to do with the ability of the municipality to use those funds for the purchase of delinquent properties from the county.

It is therefore concluded: (1) The debtor SID funds, being held in trust, may not be applied to the purchase of property pursuant to M.C.A. § 15–17–317; and (2) the Montana Legislature has not authorized a use contrary to the trust.

## V.

WHETHER THE CITY OF COLUMBIA FALLS IS AN "INSIDER" FOR THE PURPOSES OF SECTION 1129(A)(10) OF THE CODE.

The focus of this issue is the confirmation of the plans of the debtor SID's. Chapter 9 incorporates numerous provisions from other portions of the Bankruptcy Code, including 11 U.S.C. § 1129(a)(10).[33] Section 1129(a)(10) precludes confirmation of a plan with an impaired class of creditors unless at least one impaired class accepts the plan without including the vote of

> Any special assessment made and levied to defray the cost and expense of any of the work enumerated in this part, together with any percentages imposed for delinquency and for cost of collection, shall constitute a lien upon and against the property upon which such assessment is made and levied from....
>
> M.C.A. § 7–12–4191.

33. 11 U.S.C. § 901(a) lists the statutes incorporated into Chapter 9.

any insider.[34] Davidson contends the City is an insider, and consequently its vote cannot be counted for the purpose of determining acceptance of the plan.

"Insider" is a defined term under the Bankruptcy Code. 11 U.S.C. § 101(31).[35] Under the statutory definition, two relationships to debtor municipalities are characterized as "insider" relationships for the purpose of the Code: (1) elected officials of the debtor, and (2) relatives of elected officials of the debtor. In addition, managing agents of the debtor are insiders under the statute. The City is clearly neither an elected official of the debtor SID's, nor a relative of such an elected official, and thus those categories may be eliminated.

This does not mean, however, that the City must be a managing agent of the debtor SID's in order to be considered an insider. The definition of insider states the term insider "includes" these categories; the Bankruptcy Code specifically notes the term "includes" is not limiting. 11 U.S.C. § 102(3). "The use of the word 'includes' is indicative of Congress' intent not to limit the classification of insiders to the statutory definition." *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69 (Bankr. 9th Cir.1991). *See also Miller v. Schuman (In re Schuman)*, 81 B.R. 583, 585–86 (Bankr. 9th Cir.1987) (citing cases).

The legislative history of section 101(31) indicates "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R.Rep. No. 95-

595, 95th Cong., 2d Sess. 312 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6269. In interpreting section 101 together with this legislative definition, the Ninth Circuit Bankruptcy Appellate Panel found two basic classifications of insider:

First, the Code assigns insider status to entities or relatives of the debtor, or of persons in control of a related entity, whose affinity or consanguinity gives rise to a conclusive presumption that the individual or entity commands preferential treatment by the debtor. Second, insider status may be based on a professional or business relationship with the debtor, in addition to the Code's *per se* classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.

*Friedman, supra,* 126 B.R. at 69–70 (footnote omitted). "The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor." *Schuman, supra,* 81 B.R. at 586.

It must therefore be considered whether (1) the City is a managing agent under section 101(31)(F); (2) if not, whether the City nonetheless falls within the category of "insider" as contemplated by Congress. It is concluded the City constitutes an insider under either standard.

First, the City constitutes a "managing agent of the debtor." The term "managing

---

**34.** Section 1129(a)(10) provides that:
 If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
 11 U.S.C. § 1129(a)(10).

**35.** The relevant portion of section 101 provides:
 In this title—
 \* \* \* \* \* \*

(31) "insider" includes—
 \* \* \* \* \* \*
 (D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor;
 \* \* \* \* \* \*
 (F) managing agent of the debtor.
 11 U.S.C. § 101(31)(D), (F).

agent" is not defined in the Bankruptcy Code. *Rush v. Riddle (In re Standard Stores, Inc.),* 124 B.R. 318, 323 (Bankr. C.D.Cal.1991). The *Standard Stores* case appears to be the only reported opinion to frame a definition of the term.

In defining "managing agent," I therefore conclude that it refers to those entities that exert or could exert operational control over a debtor, a division or unit of a debtor, or a significant portion of a debtor's property. Such operational control would ordinarily include the ability to make personnel decisions, the authority to incur or pay obligations[,] and access to financial and other information essential to the operation of the debtor. *Standard Stores, supra,* 124 B.R. at 323.

It is clear the City is inextricably linked with the creation and operation of the debtor SID's. For example, the statute generally authorizing special improvement districts gives the power to the city or town to create SID's, to extend the time for payment of assessments levied upon properties within the districts, to permit the assessments to be paid in installments, "and to pay all expenses of whatever character in-

curred in making the improvements with special improvement warrants or bonds." M.C.A. § 7–12–4102(1).[36] It is the city, and not the SID's, that sells bonds in an amount to pay that portion of the cost of the improvements to be assessed against properties in the district.[37] The city uses the proceeds from the bonds to pay the cost of the improvements, not the special improvement district.[38] The revolving fund the city is required to create and maintain for the purpose of loaning funds to the SID's has already been discussed in this opinion,[39] as has the fact funds held in the district fund are held in trust by the city.[40] Indeed, the debtors admit in their brief that "[b]y statute, the City of Columbia Falls has control of the creation and administration of the special improvement district." Reply Brief in Support of Debtors' Position on Questions of Law, at p. 10.[41]

Therefore, in considering the holding of *Standard Stores,* it is apparent the City has "authority to incur or pay obligations," as well as "access to financial and other information essential to the operation of the debtor." *Standard Stores, supra,* 124

---

**36.** In its relevant part, section 7–12–4102 provides:

> The city or town council has power to create special improvement districts, designating them by number; to extend the time for payment of assessments levied upon the districts for district improvements for a period not exceeding 20 years or, if refunding bonds are issued pursuant to 7–12–4194, for a period not exceeding 30 years; to make the assessments payable in installments; and to pay all expenses of whatever character incurred in making the improvements with special improvement warrants or bonds.
> M.C.A. § 7–12–4102(1).

**37.** Section 7–12–4204 states:

> The city or town council shall sell bonds or warrants issued under the provisions of 7–12–4201, in an amount sufficient to pay that part of the total cost and expense of the improvements which is to be assessed against benefited property within the district, to the highest and best bidder therefor for cash at a price, including interest thereon to date of delivery, not less than that prescribed by the city council in the resolution calling for the sale of the bonds or the warrants. The city council may fix the minimum price for the bonds or war-

rants in an amount less than the face value thereof if it determines that such sale is in the best interests of the district and the city.
M.C.A. § 7–12–4204(1).

**38.** Section 7–12–4205 of the Montana Code Annotated provides in part:

> The city or town council shall use the proceeds of such sale in making payment for the cost of the improvements. Payments to contractors may be made either from time to time, on estimates made by the engineer in charge of such improvements for the city or town, or upon the entire completion of the improvements and the acceptance thereof by the city or town council.
> M.C.A. § 7–12–4205(1).

**39.** *See* discussion of Issue # 2, *supra.*

**40.** *See* discussion of Issue # 3, *supra.*

**41.** This list by no means exhausts the interrelationships between the City and the debtor SID's. *See, e.g.,* M.C.A. § 7–12–4141 (the city may call for bids on the improvements to be made to the SID); M.C.A. § 7–12–4176 (assessments on benefitted property levied by resolution of the city).

B.R. at 323. The only factor suggested in that case which may not be met here is the ability to make personnel decisions; however, it is doubtful if the SID's have any personnel, or whether those personnel are anything other than City employees charged with carrying out tasks on behalf of the SID. Moreover, the focus of the *Standard Stores* decision was "operational control," which "ordinarily include[s]" the listed factors. *Id.* Whether or not the City has the ability to make personnel decisions, it clearly has operational control of the debtors. Based on these considerations, it is found the City is a "managing agent of the debtors" within the meaning of section 101(31)(F), and is thus an insider of the debtors.

■ For essentially the same reasons, the Court concludes the City constitutes an insider within the class Congress intended to be included by its nonlimiting use of the term. Given the extent of the City's control over the debtor SID's, it "has a sufficiently close relationship with the debtor that [the City's] conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R.Rep. No. 95–595, *supra*, at 312, U.S.Code Cong. & Admin.News 1978, p. 6269. Based on the indicia of control the City has over the debtors, the SID's are the "alter egos" of the City. No authority has been cited and none has been found indicating a special improvement district has any power to make any independent decision whatsoever, even with regard to day-to-day operations. Since a parent corporation of a debtor would constitute an insider, regardless of the degree to which actual control over the subsidiary was exercised,[42] it is concluded under this test the City also must be considered an insider of the debtor SID's.

■ Debtors argue that full disclosure of insider status is sufficient to permit the City to vote under section 1129(a)(10) as incorporated into Chapter 9. In reliance, debtors cite *American United Mutual Life*

*Ins. Co. v. City of Avon Park*, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940), and *Thomas v. El Dorado Irrigation Dist.*, 126 F.2d 922 (9th Cir.1942).

This argument must be rejected for two reasons. First, there is no language under the statutes to support such an interpretation. Section 1129(a)(10) states an impaired class must accept the plan, "without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). No exception is made for circumstances where the insider relationship is fully disclosed.

Second, the cases relied upon by debtors are differentiable. In *American United*, a municipality filed a plan of composition under Chapter IX. The fiscal agent of the debtor, who proposed the plan, did not disclose it was a creditor of the debtor, that it had purchased claims both before and after the bankruptcy petition was filed (apparently for the purpose of voting those claims in favor of the plan), or that it intended to vote its claims to approve the plan. The Court held the plan was improperly approved, in that, among other things, the financial benefits the fiscal agent would receive from its speculative position as a creditor of the debtor should have been considered in assessing the total compensation to be received by the fiscal agent. 311 U.S. at 144, 61 S.Ct. at 161. The Court noted disclosure was "[t]he very minimum requirement" for fair dealing, in order the plan to be confirmed. 311 U.S. at 145, 61 S.Ct. at 161. The Court then stated:

> [w]e have emphasized that full disclosure is the minimum requirement in order not to imply that it is the limit of the power and duty of the bankruptcy court in these situations.... The responsibility of the court entails scrutiny of the circumstances surrounding the acceptances, the special or ulterior motives which may have induced them, the time for acquiring the claims so voting, the amount paid therefor, and the like.

---

42. Section 101(31) provides that insider includes an affiliate of the debtor. 11 U.S.C. § 101(31)(E). An "affiliate" is defined to include an "entity that directly or indirectly owns, controls, or holds with the power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(A).

*Id.* The Court expressed concern later in the opinion that the claims held by the fiscal agent might have been "owned, held, or controlled" by the municipality such that they should not be counted under the law as it then stood; however, the Court did not find it necessary to reach that issue. 311 U.S. at 148–49, 61 S.Ct. at 163.

*Thomas v. El Dorado Irrigation Dist.,* 126 F.2d 922 (9th Cir.1942), is also differentiable. The holding in that case turned on disclosure of the compensation the Reconstruction Finance Corporation, the fiscal agent, would receive under the proposed plan. After reviewing *American United,* the court concluded the R.F.C. had fully disclosed its compensation and that the plan was properly confirmed. 126 F.2d at 926. However, there was no contention in that case the Reconstruction Finance Corporation was an insider of the debtor, or that the debtor "owned, held, or controlled" the claims of the R.F.C., and the Ninth Circuit never addressed the concerns discussed in the latter portion of *American United.*

■ Debtors also argue the City is not exerting undue influence on the debtors or attempting to receive preferential treatment, regardless of whether it may possess the power to do so. However, the actual exercise of undue influence appears to be irrelevant to the question of status as an insider. First, in the statutory definitions of "insider," there is no discussion of actual influence; persons within the defined relationships are "insiders," regardless of the degree of actual influence they possess.[43] Second, all of the discussions considering insiders focus on the degree of the relationship, and not whether overreaching will actually take place.[44] Third, section 1129(a)(10) makes no exception to the rule that the votes of insiders are not included in determining the acceptance of the class. Had Congress intended that insider status depend on actual influence, it could have made insider status a rebuttable presumption subject to the party's ability to show otherwise.

Where, as here, the debtors are entities separate from a creditor only in a nominal sense, the danger of undue influence is simply too great. The City falls within the definition of insider, both that contained within section 101(31) and the intended reach of the term.

In summary, it is concluded:

1. The City of Columbia Falls is not required to pay assessments on property it owns within each of the debtor Special Improvement Districts;

2. The City of Columbia Falls is not required to continue funding and loaning from the revolving fund, created under M.C.A. § 7–12–4221, until the bond obligations of each of the debtor Special Improvement Districts are fully paid and discharged regardless of the term of the plan proposed by the debtor;

3. The City does not have the authority to use special assessments collected and held in a District fund for the purpose of paying delinquent general property taxes when purchasing property pursuant to M.C.A. § 15–17–317; and,

4. The City of Columbia Falls is an "insider" for the purposes of Section 1129(a)(10) of the Code; as more particularly explained in the foregoing analysis.

---

**43.** For example, a relative of a director of the debtor would be an insider, even if the director and the relative were not on speaking terms. *See* 11 U.S.C. § 101(31)(B)(vi).

**44.** *See, e.g.,* H.R.Rep. No. 95–595, *supra,* at 312, U.S.Code Cong. & Admin.News 1978, p. 6269 (in referring to a sufficiently close relationship that transactions are subject to a closer degree of scrutiny than arms length transactions, Congress indicated that insider status does not require that each transaction be examined for actual overreaching); *Friedman, supra,* 126 B.R. at 70 (characterizing those insiders not listed within section 101(31) as those with a relationship close enough to gain an advantage due to affinity, but not suggesting that any actual advantage need be shown).