**In re COUNTY OF ORANGE, a political subdivision of the State of California, Debtor.**

**COUNTY OF ORANGE, a political subdivision of the State of California, and John M.W. Moorlach, in his official capacity as Treasurer–Tax Collector of the County of Orange, Plaintiffs,**

**v.**

**MERRILL LYNCH & CO., INC., a Delaware corporation; Merrill Lynch, Pierce, Fenner & Smith, Inc., a Delaware corporation; Merrill Lynch Government Securities, Inc., a Delaware corporation; Merrill Lynch Capital Services, Inc., a Delaware corporation; Merrill Lynch Money Markets, Inc., a Delaware Corporation, Defendants.**

Bankruptcy No. SA 94–22272 JR.

Adv. No. SA 95–1045 JR.

United States Bankruptcy Court, C.D. California.

Jan. 24, 1996.

Bruce Bennett and Michael Hennigan of Hennigan, Mercer & Bennett, Los Angeles, CA, for Orange County.

Ronald L. Olson and Dennis C. Brown of Munger, Tolles & Olson, Los Angeles, CA, for Merrill Lynch.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

On November 13, 1995, Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch Government Securities, Inc., Merrill Lynch Capital Services, Inc., and Merrill Lynch Money Markets, Inc. (collectively "Merrill Lynch") filed a motion to dismiss (the "Motion") the second amended complaint (the "Complaint") filed by the County of Orange (the "County") and John M.W. Moorlach ("Moorlach").

On November 20, 1995, the County and Moorlach ("Plaintiffs") filed their opposition to the Motion. On December 1, 1995, after extensive argument on the Motion, I issued an oral decision to the parties denying the Motion and indicated that a written opinion would follow.

## JURISDICTION

This court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) (West 1995) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (West 1995) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy

judges for the Central District of California), and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (K) & (O) (West 1995).

## STATEMENT OF FACTS

On December 6, 1994, the County filed its chapter 9 bankruptcy petition. On October 25, 1995, the County and Moorlach, acting in his official capacity as Treasurer–Tax Collector of the County, filed the Complaint against Merrill Lynch claiming, in part, that by refusing to return approximately $1.6 billion of marketable securities that belonged to the County, Merrill Lynch asserted an informal proof of claim against the County and the County is entitled to the proceeds from these liquidated securities as well as interest and any other consequential damages that resulted from Merrill Lynch's conduct.

On November 13, 1995, Merrill Lynch filed the Motion arguing that the Complaint should be dismissed for failure to state claims upon which relief can be granted. Merrill Lynch contends that the securities were not property of the County and it did not assert an informal proof of claim against the County or any of the County's property.

On December 1, 1995, I held a hearing and issued an oral decision denying the Motion, indicating that I would issue a written opinion setting forth my reasoning.

## PROPER LEGAL STANDARD

■ All allegations of fact in the Complaint are assumed to be true and are considered in a light most favorable to Plaintiffs. *Fresher v. Shell Oil Co.,* 846 F.2d 45, 46 (9th Cir.1988); *Western Reserve Oil and Gas Co. v. New,* 765 F.2d 1428, 1430 (9th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88

L.Ed.2d 773 (1986); *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir.1989); *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir. 1986); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'" *Hall v. City of Santa Barbara,* 833 F.2d 1270, 1274 (9th Cir.1986) (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 598 (1969)).

■ Merrill Lynch can only prevail on the Motion if it appears beyond all doubt that Plaintiffs can prove *no* set of facts in support of their claims that would entitle the County to relief. *Arcade Water Dist. v. United States,* 940 F.2d 1265, 1267 (9th Cir.1991); *Gibson,* 781 F.2d at 1337 (quoting *Conley,* 355 U.S. at 45, 78 S.Ct. at 101–02).

## DISCUSSION

I. Alleged Facts in the Complaint That Must be Treated as True for the Purposes of Merrill Lynch's Motion to Dismiss.

Before analyzing the merits of the Motion, it is important to understand the complex facts asserted in the Complaint that must be treated as true for the purposes of the Motion. *Western Reserve Oil,* 765 F.2d at 1430. In the Complaint, Plaintiffs allege that commencing on July 1, 1991 and continuing through at least December 6, 1994 (the "Time Period"), former County Treasurer Robert Citron ("Citron") entered into hundreds of reverse repurchase agreements ("Repos") with Merrill Lynch[1] pursuant to the "Master Repurchase Agreements" (the "MRAs"). Second Am.Compl. ¶ 18.

Plaintiffs contend that under the terms of the Repos, "the County agreed to transfer possession of securities to Merrill Lynch, in

---

1. Because in the Complaint Plaintiffs define "Merrill Lynch" as all named defendants, at times, it is unclear whether Plaintiffs are referring to all the named defendants as to each and every allegation. However, Plaintiffs do assert that each named defendant either sold securities to the County or illegally extended credit to the County to enable the purchase of securities.

Second Am.Compl. ¶¶ 6–10. Plaintiffs also allege that "[a]t all times, each defendant was acting as agent of each of the remaining co-defendants; each defendant acted within the course, scope and authority of that relationship; and, as a result, the defendants are jointly and severally liable for all acts [stated in the Complaint]." *Id.* ¶ 11.

exchange for cash, and simultaneously obligated itself to later repay [sic] the cash plus interest in exchange for a return of possession of the identical securities." *Id.* Plaintiffs assert that both the County and Merrill Lynch recognized and treated the Repos as full-recourse, secured loans that obligated the County. *Id.* ¶¶ 19, 22, 26 & Ex. 23 at 175.

Under the MRAs, Plaintiffs allege that "Merrill Lynch was not authorized to sell the securities held in its possession, and was obligated to return to the County possession of the *same* securities that the County had transferred to Merrill Lynch." *Id.* ¶ 21 (emphasis in original).

Additionally, the County entered into agreements with Merrill Lynch under a Securities Loan Agreement (the "SLA") which was executed on May 10, 1993. *Id.* ¶ 24. Plaintiffs contend that all agreements drafted pursuant to the SLA were virtually identical to the Repos entered into pursuant to the MRAs. *Id.*[2]

During the Time Period, Plaintiffs allege that on a daily basis, the County and other entities (including but not limited to broker dealers, the United States government, the state of California, California governmental agencies, and various local governmental entities located within and outside the County) placed funds into the County's bank accounts. The vast majority of these funds were deposited, wired, or otherwise transferred into the County's two primary bank accounts. These two accounts were the Concentration Account and the Custodial Account (the "Accounts"). *Id.* ¶ 28. Plaintiffs characterize all the funds received by the County into the following four categories: "County Moneys," "Non–County Deposited Moneys," "Non–County Invested Moneys," and "Other Moneys." *Id.* ¶¶ 29–33. Plaintiffs allege that all the securities in the Custodial Account were identified as property of the County. *Id.* ¶ 47.

Plaintiffs state that the County regularly deposited County funds and funds that were held in trust into the Accounts. On a daily basis, funds were transferred between the

Accounts. *Id.* ¶¶ 28 & 34. Plaintiffs assert that as a result of this massive commingling, the Accounts represented an undifferentiable mass of funds at all times. Accordingly, tracing of individual funds was impossible. *Id.* ¶ 28, 36 & 37. Plaintiffs contend that Merrill Lynch was aware of this commingling. *Id.* ¶¶ 38 & 43.

Funds in the Custodial Account were used for many purposes, including payments on the Repos and the purchasing of additional securities. *Id.* ¶¶ 45 & 46. Plaintiffs allege that nearly all the securities acquired by the County were held in the Custodial Account until the securities were "sold, matured, and/or purportedly transferred to a broker-dealer under a reverse repurchase agreement," *id.* ¶ 47, and that all, or nearly all, of the securities acquired by the County were acquired by the withdrawal of funds from the Custodial Account. *Id.* ¶ 50.

Plaintiffs state that as a result of the massive commingling and inability of any entity to trace its funds in the Accounts, it is impossible to establish that any securities are legally or equitably the property of any entity other than the County or that any alleged trust funds were used for any particular purpose. *Id.* ¶¶ 49–53. Additionally, Plaintiffs assert that tracing specific trust funds to any particular securities is impossible because daily investment decisions by the County were generally made on the basis of the commingled mass of funds available in the Accounts. *Id.* ¶ 52.

As a result of this massive commingling and inability to trace the various funds (trust funds and nontrust funds, County funds and non-County funds) that were placed in the Accounts, the County contends that all the securities purchased from the commingled funds in the Accounts became the property of the County when it filed its chapter 9 petition. *Id.* ¶ 53.

Plaintiffs argue that Merrill Lynch permitted, encouraged, and advised Citron to pursue an unlawful, speculative scheme that included the borrowing, primarily through short-term Repos, of billions of dollars and

---

**2.** Hereinafter, references to the "Repos" means those agreements entered into between the County and Merrill Lynch pursuant to the MRAs and/or the SLA. *See id.* ¶ 24.

the transfer of billions of dollars of securities owned by the County to Merrill Lynch. As a result of this investment strategy, the County suffered catastrophic losses in 1994. *Id.* ¶¶ 74–77, 83–88. *See also id.* ¶¶ 89–98, 103–26.

Plaintiffs state that by June 30, 1991, Citron had obligated the County to repay approximately $1.8 billion pursuant to the Repos. Additionally, by June 30, 1992, Citron had obligated the County to repay approximately $4 billion. By June 30, 1993, this amount was $7.6 billion. *Id.* ¶ 93.

Plaintiffs also claim that from 1993 to early 1994, "Merrill Lynch fraudulently recommended that the County enter into eight 'reverse to maturity' transactions under which Merrill Lynch loaned the County the aggregate amount of $800 million." *Id.* ¶ 97; *see also id.* ¶¶ 99–102. Plaintiffs state that, as of the petition date, the Repos between the County and Merrill Lynch obligated the County to repay approximately $2.4 billion to Merrill Lynch including the $800 million in "reverse to maturity" transactions. *Id.* ¶ 96.

Plaintiffs contend that the County provided Merrill Lynch with custody of the County's securities, aggregating $2.4 billion, as collateral for these various, illegal obligations. *Id.* ¶ 96.

Beginning just prior to the County's bankruptcy filing and concluding on approximately December 8, 1994, various broker-dealers holding the County's securities as collateral for the Repos liquidated most of the County's portfolio. The County sought protection from this court (in the form of an order allowing the orderly disposition of securities) to preserve the value of its remaining portfolio. *Id.* ¶ 128.

At the time of the bankruptcy filing, Plaintiffs allege that Merrill Lynch possessed approximately $1.6 billion in marketable securities that had been transferred to it by the County under the Repos. The County alleges that it owned 100% of these securities. *Id.* ¶ 129.

Plaintiffs also assert that Merrill Lynch has refused to return these securities or to remit proceeds from the sale of the securities to the County despite the County's demands upon Merrill Lynch for the return of the County's property. *Id.* Plaintiffs further claim that in a letter dated December 15, 1994 (the "Letter"), Merrill Lynch asserted that the County owed more than $1.6 billion to Merrill Lynch pursuant to certain Repos and Merrill Lynch intended to obtain satisfaction of the debt. *Id.* ¶ 131–32.

Plaintiffs contend that through the Letter, Merrill Lynch asserted an informal proof of claim against the County. *Id.* ¶¶ 131–32 & Ex. 3 at 113–15. Plaintiffs further contend that Merrill Lynch's seizure and application of the proceeds of the sale of the securities in Merrill Lynch's possession also constituted an informal proof of claim against the County because the securities were the property of the County. *Id.* ¶ 132.

Plaintiffs allege that by January 12, 1995, Merrill Lynch had retained approximately $1.4 billion of the proceeds from the County's securities, and closings were pending on approximately $250 million of the County's remaining securities. *Id.* ¶ 131.

■ For the purposes of the Motion, Plaintiffs' allegations in the Complaint must be treated as true. Any reasonable inferences based on these allegations must also be construed in a light most favorable to the County. *Arcade Water Dist.,* 940 F.2d at 1267.

## II. The Complaint States Claims Upon Which Relief can be Granted; Therefore, Merrill Lynch's Motion is Denied.

Merrill Lynch asserts in the Motion that the Complaint fails to state claims[3] upon

---

3. The Complaint specifically alleges six claims (the "Claims") and six counterclaims (the "Counterclaims").

The Claims alleged by the County are: for a determination pursuant to 11 U.S.C. § 502(b) that Merrill Lynch's claims against the County are not allowable and are unenforceable because the claims are based on *ultra vires* and void

Repos, Second Am.Compl. ¶¶ 133–37 (First Claim); for a determination pursuant to 11 U.S.C. § 502(b) that Merrill Lynch's claims against the County are unenforceable and not allowable because the County is entitled to a setoff exceeding any of Merrill Lynch's claim amounts, *id.* ¶¶ 145–50 (Second Claim); for a determination pursuant to 11 U.S.C. § 510(c)(1)

which relief can be granted, because the securities involved in the underlying transactions were never property of the County. Merrill Lynch argues that California Government Code ("Cal.Gov.Code") § 27100.1[4] requires that the County Treasurer, not the County,[5] hold in trust all funds deposited by non-County participants in the investment pool (the "OCIP") and the trust nature of these funds is not destroyed by the County's bankruptcy filing regardless of the level of commingling of County and non-County funds in the OCIP, the solvency of the County, or the inability to trace the trust funds in the OCIP. Mot.Dismiss Second Am.Compl. at 22.

Merrill Lynch also argues that even if the securities in the OCIP are property of the County, judicial estoppel prevents the County from asserting this legal argument in light of its previous positions in other proceedings in this bankruptcy case. Merrill Lynch states that "[h]aving repeatedly represented to this Court and the Superior Court that it

and any applicable state law that any allowable claim of Merrill Lynch against the County's property is equitably subordinated to all allowed claims of the County's other creditors, *id.* ¶¶ 159–66 (Third Claim); for a determination that the property Merrill Lynch controls pursuant to the Repos is the County's property, *id.* ¶¶ 177–84 (Fourth Claim); for enforcement of the automatic stay under 11 U.S.C. §§ 362 & 922, *id.* ¶¶ 195–211 (Fifth Claim); and for avoidance of unauthorized, postpetition transfers under 11 U.S.C. § 549, *id.* ¶¶ 230–40 (Sixth Claim).

The Counterclaims alleged by the County are: for restitution for violations of California Constitution, Article XVI, § 18 and California Government Code §§ 23006, 25256 & 29120, *id.* ¶¶ 254–69 (First Counterclaim); for restitution for violations of California Government Code §§ 27000, 53601 & 53635, *id.* ¶¶ 270–87 (Second Counterclaim); for damages for breach of a fiduciary duty, *id.* ¶¶ 288–96 (Third Counterclaim); for damages for aiding and abetting a breach of fiduciary duty owed by Citron to the County, *id.* ¶¶ 297–307 (Fourth Counterclaim); for damages for conspiracy to make unauthorized use of public funds, *id.* ¶¶ 308–22 (Fifth Counterclaim); and for fraud and for damages for violations of federal securities law, the California Corporations Code, and the California Business and Professions Code, *id.* ¶¶ 323–44 (Sixth Counterclaim).

In the Complaint, Plaintiffs also assert six alternative claims based on the premise that the County is solely the trustee and not the owner of the securities withheld by Merrill Lynch. *Id.* ¶¶ 138–44, 151–58, 167–76, 185–94, 212–29 &

does *not* own the property in the pool, and having benefitted from that representation, the County cannot now reverse its position and contend that it does." *Id.* at 17.

Additionally, Merrill Lynch contends that all the Counterclaims must be dismissed because Merrill Lynch never asserted a claim against the County or any property of the County. Merrill Lynch alleges that absent a finding that it asserted a proof of claim against the County, the Counterclaims should be treated as claims that must be dismissed because this court lacks jurisdiction over the alleged causes of action. *Id.*

Plaintiffs respond that Ninth Circuit and California state law are directly contrary to Merrill Lynch's position. The County argues that when "an *insolvent* trustee-debtor controls assets that are the *untraceable* product of a *commingled* mass of the debtor's own moneys and trust moneys, the assets are 'property of the debtor' and therefore subject to the bankruptcy court's equitable jurisdic-

241–52. The County argues that the Counterclaims would survive under this alternative premise. Pls.' Opp'n Mot. Dismiss at 33 & n. 30. Because I hold that the Complaint through the Claims and Counterclaims sufficiently alleges claims upon which relief can be granted, I will not examine the merits of the County's alternative trustee claims and theories.

4. Cal.Gov.Code § 27100.1 states:

Notwithstanding any other provision of law, when any public entity or any public official acting in a fiduciary capacity, who is required by law to deposit funds into the county treasury, makes a deposit, those funds shall be deemed to be held in trust by the county treasurer on behalf of the depositing entity or public official. The funds shall not be deemed funds or assets of the county and the relationship of the depositing entity or public official and the county shall not be one of creditor-debtor.

Cal.Gov't Code § 27100.1 (West Supp.1995).

5. Merrill Lynch asserts that the County is not the trustee of funds deposited under § 27100.1. Merrill Lynch argues that only the County Treasurer, presumably acting in some type of individual capacity, is the trustee of funds deposited by public entities under § 27100.1; therefore, an essential prerequisite to the filing of the Complaint has not been satisfied by the County. Mot.Dismiss Second Am.Compl. at 23–25; Reply Mem.Supp.Mot.Dismiss Second Am.Compl. at 20.

tion to ensure an appropriate distribution to the debtor's general creditors." Pls.' Opp'n Mot.Dismiss Second Am.Compl. at 2 (emphasis in original).

Plaintiffs further argue that Cal.Gov.Code § 27100.1 does not change this basic proposition. Plaintiffs assert that "§ 27100.1 only establishes the existence of a trust relationship and identifies the initial trust *res.* The statute has no impact on the requirement that a trust beneficiary must trace from the initial trust *res* to particular assets controlled by an insolvent, commingling trustee." *Id.* at 2–3; *see also id.* at 9–10.[6]

Plaintiffs also assert that the County is not judicially estopped from bringing the claims stated in the Complaint because "there is no legal inconsistency between the Court's conclusion [in previous hearings concerning different litigation in this case] that the County did not own certain securities in the County's 'individual' capacity and the County's consistently taken position that the disputed securities are property of the County." *Id.* at 19.

With respect to this court's jurisdiction over the Claims and Counterclaims, Plaintiffs contend that Merrill Lynch's actions constituted an informal proof of claim; therefore, this court has proper jurisdiction to hear all the causes of action stated in the Complaint. *Id.* at 3, 22–26.

■ Plaintiffs' assertion that, at the time of the bankruptcy filing, the securities in the possession of Merrill Lynch were property of the County is not inconsistent with controlling federal bankruptcy law. If the facts alleged in the Complaint are true, the securities in Merrill Lynch's possession pursuant to the Repos became property of the County upon its chapter 9 filing. The County has pled sufficient facts to allege that Merrill Lynch filed an informal proof of claim against the County, and the County is not judicially estopped from asserting any of the Claims or Counterclaims in the Complaint.

A. Plaintiffs' Assertion That the County is a Trustee of Funds Deposited Into the Accounts Under Cal.Gov.Code § 27100.1 is not Contrary to California law.

■ State law determines whether a trust exists in federal bankruptcy proceedings. *Danning v. Bozek (In re Bullion Reserve of N. Am.),* 836 F.2d 1214, 1217–18 (9th Cir. 1988); *Toys "R" Us, Inc. v. Esgro, Inc. (Matter of Esgro, Inc.),* 645 F.2d 794, 797 (9th Cir.1981); *Elliott v. Bumb,* 356 F.2d 749, 753 (9th Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966).

Merrill Lynch and Plaintiffs agree that when public entities deposited funds into the County treasury, a trust was created under Cal.Gov.Code § 27100.1; however, the parties disagree over who is the trustee of those funds. Merrill Lynch asserts that under § 27100.1, the County Treasurer *alone* is the trustee. It relies primarily on the language of § 27100.1 which states that "those funds [deposited by the public entity] shall be deemed to be held in trust by the county treasurer." Cal.Gov't Code § 27100.1 (West Supp.1995). The County responds that "when a California statute imposes a duty on a county official, that duty is imposed on the County itself." Pls.' Opp'n Mot.Dismiss Second Am.Compl. at 14.

■ I hold that under Cal.Gov.Code § 27100.1 a trust was created when public entities deposited their funds into the County treasury, and the County was either an express or implied trustee of those funds under California law.

*1. Under California law, the County was either an express or implied trustee for the trust established pursuant to § 27100.1.*

A county treasurer is an officer of the county for which he/she is appointed or elected. Cal.Gov't Code § 24000(f) (West 1994). In its landmark case defining public/county officers, the California Supreme Court held:

6. The County does make the alternative argument that to the extent that Merrill Lynch's interpretation of CalGov.Code § 27100.1 is correct, § 27100.1 is in direct conflict with federal bankruptcy law and should be preempted. Pls.' Opp'n Mot.Dismiss Second Am.Compl. at 10–14.

A public officer is a *public agent,* and *as such acts only on behalf of his principal, the public, whose sanction is generally considered as necessary to give the act performed by the officer the authority and power of a public act or law.* The most general characteristic of a public [county] officer which distinguishes him from a mere employee, is that a public duty is *delegated* and *intrusted* [sic] to him, *as agent,* the performance of which is *an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting....* As a matter of course, in keeping with these definitions, a county officer is a public officer ... and is selected by the political subdivision of the state called the 'county' *to represent* that governmental unit, continuously and as part of the regular and permanent *administration of public power,* in carrying out certain acts with the performance of which *it is charged on behalf of the public.*

*Coulter v. Pool,* 187 Cal. 181, 187, 201 P. 120 (1921) (citations omitted) (emphasis added); *see also Dibb v. County of San Diego,* 8 Cal.4th 1200, 1212, 36 Cal.Rptr.2d 55, 884 P.2d 1003 (1994); *Spreckels v. Graham,* 194 Cal. 516, 530, 228 P. 1040 (1924); *Sheboygan County v. Parker,* 70 U.S. (3 Wall.) 93, 18 L.Ed. 33 (1865).

When Citron received funds pursuant to CalGov. § 53684,[7] he represented the County in carrying out the trust obligations imposed by § 27100.1. The County's assertion that it was a trustee of those funds is not inconsistent with California law. The County, through its representative, Citron, had express trustee responsibilities to the beneficiaries of the § 27100.1 trust.

Alternatively, the County is an implied trustee of the § 27100.1 trust. In *City of Fullerton v. County of Orange,* 140 Cal.App. 464, 35 P.2d 397 (1934), the California appellate court examined the legal status of county

officers when they perform additional functions imposed by law. *Id.* at 470–72, 35 P.2d 397. The court noted that when county officers collect taxes for a city under state law, the county officers "are *ex-officiis officers* of that city. They become by law, the agents of the city to collect the taxes for the city. They do not lose their identity as county officers. Although they act for the city, they are county officers, *performing a county function imposed upon them by law.*" *Id.* at 470, 35 P.2d 397. (citation omitted) (emphasis added). The court also stated that in this situation the "the relationship between the county and the city is an *implied or constructive trust, an involuntary trust* arising by operation of law...." *Id.* at 472, 35 P.2d 397 (emphasis added).

In *County of Los Angeles v. Superior Court,* 17 Cal.2d 707, 112 P.2d 10 (1941), the California Supreme Court relied primarily on *City of Fullerton* in holding that "county officers do not lose their identity as such by holding, ex-officio, the other public offices thrust upon them, but they act in a dual capacity, *and through them the county becomes the bailee or trustee* of tax funds *of other entities deposited in its treasury.*" *Id.* at 717, 112 P.2d 10 (emphasis added). *See also County of San Diego v. Croghan,* 2 Cal.App.2d 494, 497–98, 38 P.2d 474 (1934) (statutory delegation of responsibility to a county treasurer to collect taxes for other public entities establishes that the county is either a trustee or a bailee).

Like the situations in *City of Fullerton* and *County of Los Angeles,* Citron acted as trustee for the public agencies that deposited funds with him under state law. Citron, however, retained his status as a county officer while performing these trustee duties. Section 27100.1 did not require that Citron act solely in his individual capacity while carrying out his responsibilities. Because Citron was an agent for the County during the entire Time Period, California law im-

---

7. Cal.Gov.Code § 53684 permits local public agencies to deposit their excess funds in the local county treasury. Cal.Gov't Code § 53684 (West Supp.1995). Interestingly, § 53684 states that local agencies may only do this with the consent of the county treasurer. Applying Merrill Lynch's analysis of § 27100.1 to § 53684, local

agencies would not need the consent of the County to deposit funds with the County treasurer. Theoretically, the County treasurer would be able to authorize deposits by local public agencies into the County treasury over the County's objections. Obviously, the state legislature could not have intended this result.

posed trustee responsibilities on the County. *See City of Fullerton,* 140 Cal.App. at 472, 35 P.2d 397; *County of Los Angeles,* 17 Cal.2d at 715–17, 112 P.2d 10; *see also City of Centerville v. Turner County,* 25 S.D. 300, 126 N.W. 605, 606 (1910).

■ Having established that § 27100.1 created a trust in which the County had trustee duties and responsibilities to the beneficiaries of the OCIP, Plaintiffs argue that federal bankruptcy law governs the determination of the County's property interests to the securities, and any proceeds from the sale of such securities, that Merrill Lynch held when the bankruptcy was filed. Merrill Lynch responds that California law should control this determination and § 27100.1 is clear on its face that Citron held the securities in trust for the OCIP participants.

B. Cal.Gov.Code § 27100.1 is in Direct Conflict with Federal Bankruptcy Law, Because it Dictates the Priority of Distribution to a Special Class of Creditors Over Other Creditor Classes.

On its face, § 27100.1 creates a trust for funds deposited with a county treasurer by non-county entities irrespective of conflicting federal bankruptcy law. In essence, § 27100.1 seeks to establish a priority for non-county trust participants regardless of the claims other county creditors might have to the same assets. This directly conflicts with federal bankruptcy law and the goal of a fair and equitable distribution to all creditors of a bankrupt's estate. *Elliott,* 356 F.2d at 755; *In re Bullion Reserve,* 836 F.2d at 1218; *First Fed. of Michigan v. Barrow,* 878 F.2d 912, 915 (6th Cir.1989).

■ Under federal bankruptcy law, a creditor beneficiary of an *insolvent,* trustee debtor must be able to trace its funds otherwise the funds become property of the debt-

or. *In re Bullion Reserve,* 836 F.2d at 1218; *Elliott,* 356 F.2d at 754–55; *Barrow,* 878 F.2d at 915 ("Accordingly, having asserted a constructive trust of which they were beneficiaries, the appellants assumed the burden of identifying the sums of their entitlements by tracing the trust funds through ... [the insolvent, trustee debtor's] commingled accounts."); *Sender v. The Nancy Elizabeth R. Heggland Family Trust & Radoy W. Heggland (In re Hedged–Inv. Assocs., Inc.),* 48 F.3d 470, 474 (10th Cir.1995) ("When property of the estate is alleged to be held in trust, the burden rests upon the claimant to establish the original trust relationship. He must prove his title, identify the trust fund or property in the estate, and if such fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property.") (quoting 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1994)); *see also Sonnenschein v. Reliance Ins. Co.,* 353 F.2d 935, 937 (2d Cir.1965); *Merrill v. Abbott (In re Indep. Clearing House Co.),* 77 B.R. 843, 854 (Bankr.D.Utah 1987) (holding in the context of a Ponzi scheme that "when a debtor obtains money by fraud and mingles it with other money ... the money is 'property' of the debtor").

■ In *Bullion Reserve,* the Ninth Circuit addressed this precise point. It held that a beneficiary of an insolvent, trustee debtor must be able to trace its funds in order to claim any property of the debtor. Absent this tracing, all the funds shall be treated as property of the debtor to guarantee the equal treatment of creditors under the Bankruptcy Code (the "Code").[8] *In re Bullion Reserve,* 836 F.2d at 1218. When a trustee debtor is *insolvent* and the beneficiaries cannot trace their funds, the beneficiaries must stand in the position of general creditors. *Barrow,* 878 F.2d at 915;[9] *see also State of Wisconsin v. Reese (In re Kennedy & Cohen, Inc.),* 612 F.2d 963, 966 (5th

---

8. The Code is set forth in 11 U.S.C. §§ 101–1330 (West 1995).

9. The Sixth Circuit stated in *Barrow* that:
 Once the trust relationship has been established, one claiming as cestui que trust thereunder must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the

debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate.
*Barrow,* 878 F.2d at 915 (quoting 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1988)).

Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *Gulf Petroleum v. Collazo*, 316 F.2d 257, 262 (1st Cir.1963); *John Deere Plow Co. v. McDavid*, 137 F. 802, 812 (8th Cir.1905). Any other result would destroy the level playing field for creditors established by the Code.

Merrill Lynch argues that "California Supreme Court precedent establishes that where trust funds are commingled with purported nontrust funds, the result is not that the County owns *all* the funds in the pool, but instead that it owns *none* of those funds." Mot.Dismiss Second Am.Compl. at 4. Merrill Lynch relies on *Tretheway v. Tretheway*, 16 Cal.2d 133, 104 P.2d 1033 (1940), and some related cases for this proposition.

*Tretheway* and its progeny, however, involve *solvent*, debtor trustees. The rule delineated in *Tretheway* makes sense for *solvent*, debtor trustees, because sufficient assets exist to pay trust beneficiaries and trustee creditors in full. Tracing is not essential, because no creditor group suffers at the hands of another. Obviously, this is not the case with an *insolvent*, trustee debtor.[10] The Ninth Circuit recognized this crucial difference; this is why *Bullion Reserve* and its related cases require tracing when the trustee debtor is insolvent.[11]

Merrill Lynch also argues that the rule requiring tracing in insolvent, debtor trustees situations only applies in constructive, implied trustee situations. Rep.Mem.Supp.Mot.Dismiss Second Am. Compl. at 7. In other words, Merrill Lynch asserts that *Bullion Reserve* does not apply to express trusts. This contention conflicts with dicta in the *Bullion Reserve* opinion that states "[m]oreover, even if an express trust were created, [the beneficiary] ... *would still have a duty under federal bankruptcy law* to trace his funds to the bullion he

received. Such a tracing requirement is necessary to further the Bankruptcy Code's policy of equal distribution among similar situated creditors." *In re Bullion Reserve*, 836 F.2d at 1218; *see also In re Hedged–Inv. Assocs., Inc.*, 48 F.3d at 474.

■ Logically, there should be no difference regarding tracing for an insolvent, debtor trustee whose duties arise out of an express trust as opposed to an implied trust. The tracing requirement is necessary to ensure the Code's policy of equal distribution among similarly situated creditors. *In re Bullion Reserve*, 836 F.2d at 1218.

> Giving effect to [the state law under scrutiny] ... would open the door to state creation of priorities in favor of various classes of creditors by labeling such priorities as 'trusts.' This would tend to thwart or obstruct the scheme of federal bankruptcy.... We cannot believe ... that Congress contemplated that if trust funds are commingled with other assets of one subsequently declared bankrupt under federal law, a state statute may impress a trust on all assets of the bankrupt's estate to the extent of the amount due the beneficiary.

*Elliott*, 356 F.2d at 755. Accordingly, the tracing requirement applies to insolvent, debtor trustees of both express and implied trusts. *In re Bullion Reserve*, 836 F.2d at 1218.

■ To the extent that § 27100.1 was intended to eliminate tracing when a debtor trustee is insolvent, it conflicts with federal bankruptcy law. The California state legislature passed § 27100.1 in response to concerns expressed when Butte County considered filing bankruptcy, *see* Req.Judicial Not.Supp.Mot.Dismiss Second Am.Compl., Ex. B at 5–46 (numerous documents contain-

---

10. Interestingly, absent § 27100.1, California state law does not conflict with federal bankruptcy law and requires a beneficiary of an insolvent, trustee debtor to trace any funds that he intends to claim as his property. *Kobida v. Hinkelmann*, 53 Cal.App.2d 186, 195, 127 P.2d 657 (1942) (noting that when a trustee is insolvent, and the rights of other creditors are involved, a beneficiary must trace his funds through a trustee's commingled account).

11. Likewise, the other major cases that Merrill Lynch cites are unhelpful, because they primarily involve state law interpretation of trust issues and consider the tracing issue solely in the context of solvent trustees. *See, e.g., Levy v. Drew*, 4 Cal.2d 456, 50 P.2d 435 (1935); *Cent. Nat'l Bank of Baltimore v. Connecticut Mut. Life Ins. Co.*, 104 U.S. 54, 26 L.Ed. 693 (1881); *Kinert v. Wright*, 81 Cal.App.2d 919, 185 P.2d 364 (1947).

ing an exhaustive exploration of the legislative history of Cal.Gov.Code § 27100.1), and the need to make sure that the funds of depositing entities would not be considered property of a bankrupt county. *Id.; see also* Cal.Gov't Code § 27100.1 (West Supp.1995) ("The funds shall not be deemed funds or assets of the county and the relationship of the depositing entity or public official and the county shall not be one of creditor-debtor.").[12]

■ When a state law conflicts with federal bankruptcy law, the state law is preempted. *Elliott,* 356 F.2d at 755 ("If state law is contrary to federal bankruptcy law, the state law must yield."). Therefore, to the extent that § 27100.1 creates a special class of creditors (i.e., non-County governmental entities) in conflict with the priority scheme in the Code, it is preempted by federal law.

■ State trust law must be applied in a manner consistent with federal bankruptcy policy. This essential legal principle is founded in the United States Constitution. The Constitution states that "Congress shall have the power . . . [t]o establish . . . uniform Laws on the subject. of Bankruptcies throughout the United States." U.S. Const., art. I, § 8(4). The Constitution also states that the laws of the United States made in pursuance of the Constitution "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding." U.S. Const., art. VI.

■ The California legislature cannot rewrite bankruptcy priorities.[13] "[The Code]

explicitly defined the order of creditor priority and declared the congressional intent of federal supremacy over declared but conflicting state law orders of priority." *Barrow,* 878 F.2d at 915. *See Elliott,* 356 F.2d at 754–55 ("Congress has made even clearer its intent that state law shall not be permitted to confer preference on one class of creditors of one adjudged bankrupt under federal law even though the state may have the highest public purpose in attempting to do so."); *In re Bullion Reserve,* 836 F.2d at 1218. *See also In re Kennedy & Cohen, Inc.,* 612 F.2d at 966.

### C. Chapter 9 Does Not Require a Different Result from General Bankruptcy Law for an Insolvent, Debtor Trustee.

■ Merrill Lynch asserts that "even if this Court were otherwise free to override state law by invoking federal policy, it is not free to do so under Chapter 9." Mot.Dismiss Second Am.Compl. at 12. Merrill Lynch argues that Code § 903 prevents this court from preempting § 27100.1. Merrill Lynch also asserts that under chapter 9, Congress "invited the *states* to determine for themselves what shall constitute 'property of the debtor . . . .'" Reply Mem.Supp.Mot.Dismiss Second Am.Compl. at 9. Merrill Lynch supports this argument by pointing out that Congress did not incorporate Code § 541 [14] into chapter 9. *See* 11 U.S.C. § 901 (West 1995). Additionally, Merrill Lynch contends that chapter 9 does not "dictate priorities among creditors, since § 901 of the Bankruptcy Code does not incorporate § 507[ (a)(2)–(a)(9) ] . . . into Chapter 9." *Id.* at 6.[15]

---

**12.** In the entire legislative history of § 27100.1, no discussion of the law's potential conflict with federal bankruptcy law is evident.

**13.** This point is universally recognized by the courts and legal scholars. *See, e.g.,* 3 *Collier on Bankruptcy* ¶ 507.02 (15th ed. 1995) ("State legislatures cannot create bankruptcy priorities.").

**14.** Code § 541 is but one section that defines what is and is not property of the estate. *See* 11 U.S.C. § 541 (West 1995). Section 541 is not incorporated into chapter 9. *See* 11 U.S.C. § 901 (West 1995).

**15.** Section 507(a) delineates certain priorities that apply in distributing assets of the estate. *See* 11 U.S.C. § 507(a) (West 1995). Section 901 states that only § 507(a)(1), and not §§ 507(a)(2) through (a)(9), of the Code may be applied in a chapter 9 proceeding. *See* 11 U.S.C. § 901 (West 1995).

Merrill Lynch cites no case law for its contention that chapter 9 eliminates federal priorities and defers to state law with respect to the fair distribution of a municipality's property; rather, Merrill Lynch contends that solely chapter 9's failure to incorporate Code §§ 541 and 507(a)(2) through (a)(9) demonstrates its assertions.

*1. Code § 903 does not prohibit federal bankruptcy law from preempting Cal.Gov.Code § 27100.1.*

Code § 903 is designed to ensure that chapter 9 does not prevent the State from acting in its exercise of the *political* or *governmental* powers of the debtor-municipality.

> [Section 903] contemplates absolutely no interference with the *operation* of the municipality and the *provision of governmental services* .... Because the municipality is a creation of state law and operates by virtue of the delegation of power from the state, it would probably be an unconstitutional interference with the sovereignty of the state if ... [§ 903] attempted to give the judge any power to determine whether the petitioner *should continue to operate,* or *what level of services or type of services the petitioner should provide.*

121 Cong.Rec. H39413 (daily ed. Dec. 9, 1975) (statement of Representative Edwards about the intent of Bankruptcy Code § 903).

■■■ This court cannot interfere with the County's *ability to continue its operations* or dictate *what type of services or level of services the debtor municipality may provide.* Federal preemption of CalGov. § 27100.1 does not affect the County's operations or the ability of the County to provide services. Accordingly, Code § 903 does not prevent federal bankruptcy laws from preempting § 27100.1.

*2. The absence of § 541 in chapter 9 does not mean that Congress left all property right determinations to the states.*

Congress had good reasons for excluding § 541 from chapter 9, and its absence does not necessarily lead to the conclusion that Congress left all property right determinations to the states. Most of the provisions of § 541 are inapplicable to a chapter 9 debtor, and those that are arguably applicable are otherwise covered in the avoidance provisions incorporated in chapter 9. The absence of § 541 does not conclusively establish that Congress intended to overrule general bankruptcy law regarding the status of commingled assets of an insolvent, trustee debtor.

*a. Several sections of the Code that are applicable to chapter 9 invalidate or alter state property rights.*

The weakness of Merrill Lynch's argument that by excluding § 541 from the Code Congress invited the states to define their property rights in a chapter 9 proceeding is demonstrated by the many Code provisions, *which ARE applicable to chapter 9,* invalidating state property rights. These provisions demonstrate that Congress did not grant states complete freedom to define the property interests of chapter 9 debtors.

■■■ For example, Code § 545, which is specifically made applicable to chapter 9 in § 901, invalidates certain statutory liens created by state law.[16] State statutory liens are property rights. Another example is Code § 552. Section 552 invalidates all consensual security interests with respect to property *received post-petition.* Security interests are property rights that are usually defined by state law. Section 552(b)(2) offers a compelling example of Congressional intent not to let states decide freely what shall be property of the debtor.[17]

---

**16.** With regards to § 545, Collier's notes that:
> [s]tatutory liens may, however, easily become a means of frustrating the bankruptcy scheme of distribution, *which recognizes but a limited number of priorities* superior to the right of the general creditors to pro rata distribution. Congress recognized in 1938 that some limitation should be imposed on the enforcement of statutory liens in bankruptcy.... The imposition of these limitations is the function of section 545.

4 *Collier on Bankruptcy* ¶ 545.01(3) (15th ed. 1995).

**17.** Section 552(b)(2) states:
> [Except as provided in other specific code sections] if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property ... then such security interest extends to such rents ... acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(2) (West 1995). Section 552(b)(2) was recently added to the Code under the Bankruptcy Reform Act of 1994. *See* Pub.L. No. 103–394, 108 Stat. 4106 (enacted on October

---

[Section 552(b)(2) was added] to deal with the confusion about the applicability of the exception in former subsection (b) to rents. In particular, in *Butner v. United States* [440 U.S. 48, 49, 99 S.Ct. 914, 915, 59 L.Ed.2d 136 (1979)], the United States Supreme Court held that a mortgagee's right to rents should be decided under state law and that courts 'should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would under state law if no bankruptcy has ensued.' Moreover, former section 552(b) expressly stated that the creditor's rights to rents was dependent on 'applicable nonbankruptcy law ...' Thus in determining whether a creditor had a postpetition interest in rents generated from property acquired prepetition, many courts analyzed whether the creditor had perfected its interests in rents under applicable state law.

*Subsection (b)(2) does not refer to applicable nonbankruptcy law and is intended to provide a creditor with a valid postpetition interests in rents notwithstanding its failure to perfect its security interests under applicable state law.*

4 *Collier on Bankruptcy* ¶ 552.03 (15th ed. 1995) (emphasis added).

In determining what provisions of the Code would apply to a chapter 9 debtor, Congress did not leave it to the states to determine absolutely those property rights.[18] These examples rebut Merrill Lynch's contention that by excluding § 541 from chapter 9, Congress intended all property rights to be determined in accordance with state law irrespective of the impact on key bankruptcy goals such as the fair and equitable treatment of a debtor's creditors.

3. *The absence of §§ 507(a)(2) through (a)(9) in chapter 9 does not mean that Congress intended to eliminate the priority scheme for chapter 9 debtors.*

Likewise, with regards to § 507(a), the failure to include §§ 507(a)(2) through (a)(9) makes sense in light of the relevance of §§ 507(a)(2) through (a)(9) to chapter 9. For example, § 507(a)(7) involves allowed claims of a spouse. Obviously, this is irrelevant to a municipal debtor and does not need to be incorporated into chapter 9.[19] Accordingly,

---

22, 1994, effective in cases commenced on or after the date of enactment).

**18.** Besides the two sections mentioned, there are several additional Code provisions, specifically incorporated into chapter 9, that affect state property rights and support the idea that Congress did *not* invite states to determine absolutely their property rights in chapter 9. For example, § 347(b) controls the distribution of property that has not been claimed at the expiration of the time allotted for participation in the plan in a case under chapter 9.

Any 'security, money, or other property' remaining unclaimed reverts to the debtor or the entity which has acquired the assets of the debtor under the plan.... Corresponding provisions in the Bankruptcy Act, Section 96(d) with regard to the adjustment of debts of a municipality ... were found to be constitutional, notwithstanding *their effect upon the vested rights of those parties preempted from participation in distribution under the plan.*

2 *Collier on Bankruptcy* ¶ 347.04 (15th ed. 1995) (emphasis added). *See In re Grand Rapids R. Co.,* 28 F.Supp. 802, 803 (W.D.Mich.1939) ("It is urged that the unknown bondholders have vested in the securities and that to turn the unclaimed securities over to the reorganized debtor would result in the unjust enrichment of the known bondholders.... [I]t was the clear intent of Congress to provide a limitation ...

within which security holders shall present or surrender their securities. The fact that this provision affects vested rights does not render it unconstitutional. The power of Congress to enact bankruptcy laws necessarily implies the power to affect vested rights of many kinds.").

**19.** Likewise §§ 507(a)(5), (a)(6), (a)(8) and (a)(9) are not applicable to a chapter 9 debtor. *See* 11 U.S.C. §§ 507(a)(5) (unsecured claims of persons engaged in the production of grain *against a debtor who owns or operates a grain storage facility* or for persons engaged as a U.S. fisherman against *a debtor who has acquired fish or fish produce from a fisherman*), (a)(6) (unsecured claims against a debtor up to $1,800 for individuals who deposited such money with the debtor prior to the commencement of the case in connection with the purchase, lease, or rental of property or the purchase of services *for the personal family or household use of such individual* that were not provided), (a)(8) (allowed unsecured claims of a governmental unit) & (a)(9) (allowed unsecured claims based upon a commitment by the debtor to a federal depository institutions regulatory agency to maintain the capital of an insured depository institution) (West 1995).

As to §§ 507(a)(3) & (a)(4), their inclusion into chapter 9 would cause potential interference in the relationship between the municipality and its employees (e.g., collective bargaining agree-

there are valid reasons why Congress only incorporated § 507(a)(1) into chapter 9, and those reasons do not lead to the conclusion that Congress intended to eliminate federal priorities under chapter 9.

The sparse case law on chapter 9 is in support of this position. In *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970 (Bankr.D.Neb.1989), the court held that a plan of adjustment that did not recognize a state priority of bondholders before warrant-holders, and which impaired the rights of some bondholders, would be permitted under chapter 9. *Id.* at 974. *See also Sanitary Improvement Dist. v. First Nat'l Bank of Aurora*, 73 B.R. 205 (Bankr.D.Neb.1986), *aff'd*, 79 B.R. 877 (D.Neb.1987).

a. Chapter 9 incorporates priority schemes into its provisions despite the absence of Code §§ 507(a)(2) through (a)(9).

Chapter 9 incorporates many provisions of the Code that prioritize creditors to ensure a fair distribution. Additionally, many of the provisions in chapter 9 depend upon the prioritizing of creditors.

For example, § 943(a)(7) permits confirmation of a plan of adjustment only if "it is in the best interests of creditors and is feasible." 11 U.S.C. § 947(a)(7) (West 1995).

[While the best interests of the creditors test is an elusive standard in Chapter 9] nevertheless the concept is not without meaning. . . . The concept should be interpreted to mean that the plan must be better than the alternative that creditors have. In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds. . . . [The courts] must apply the test to **require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case.**

4 *Collier on Bankruptcy*, ¶ 943.03(7) (15th ed. 1995) (emphasis added). If states could rewrite priorities in chapter 9, this test would become extremely difficult to satisfy.

Section 901 also applies §§ 364(c), 364(d), and 364(e) to a chapter 9 bankruptcy. These three sections extend priority to creditors of the chapter 9 debtor who are willing to provide a debtor with additional credit. For example, § 364(c) grants a "superpriority" status for an entity extending credit to the debtor if a debtor is unable to obtain credit under other provisions of the Code. Clearly, based on these examples, chapter 9 establishes priorities that bind creditors of a debtor.[20]

If chapter 9 permitted states to define all properties of the debtor in bankruptcy regardless of the situation and to rewrite bankruptcy priorities, then chapter 9 would become a balkanized landscape of questionable value. Moreover, chapter 9 would violate the constitutional mandate for *uniform* bankruptcy laws. *See* U.S. Const., art. I, § 8.

---

ments). This affects the *ability* of a municipality to continue its operations. These two sections potentially conflict with § 903 and the 10th Amendment; therefore, Congress excluded them from a chapter 9 bankruptcy. *See* 11 U.S.C. §§ 507(a)(3) & (a)(4) (West 1995). *Compare with* 11 U.S.C. § 903 (West 1995).

20. There are many more examples of chapter 9's reliance on fair prioritizing to ensure equal distribution to all creditors. Section 1129(b)(1), incorporated into chapter 9 by § 901, requires the court to determine that the plan does not discriminate unfairly and is equitable. Applying this standard in plan confirmation hearings requires this court to make determinations regarding the fairness of distributions in accordance with traditional priority schemes.

Chapter 9, through § 901, also incorporates Code § 544. Section 544 confers on the debtor (or trustee) strong-arm powers to avoid certain transfers. Courts have recognized that the debtor/trustee's strong-arm powers serve essentially "to marshal all of the debtor's assets, including some the debtor could not recover, in order to enhance resources available to the pool of creditors."

When exercising § 544's avoidance powers, courts have held that the debtor/trustee "is not asserting a cause of action belonging to the debtor, but is acting in a representative capacity on behalf of all the creditors." *Fairbanks Steam Shovel Co. v. Wills*, 240 U.S. 642, 648, 36 S.Ct. 466, 468–69, 60 L.Ed. 841 (1916); *Barrow*, 878 F.2d at 916–17. In applying § 544 to a chapter 9, Congress was ensuring that the creditors received all the funds that the municipal debtor could reach. It defies logic to assert that Congress was concerned with increasing the estate for all creditors in chapter 9, while at the same time permitting the individual states to dictate the playing field.

Reserving to bankruptcy law the setting of priorities in chapter 9 does not unnecessarily impinge on states' rights or the ability of a municipal debtor to provide important services to the public. Nor does this principle conflict with Code § 903, which reserves to the state the power to control the municipal debtor in the exercise of its political or governmental powers. *See* 11 U.S.C. § 903 (West 1995); *see also, supra* section II.C.1.

Furthermore, pursuant to Code § 109(c)(2), a municipal debtor must be specifically authorized by state law to file a chapter 9. *See* 11 U.S.C. § 109(c)(2) (West 1995). CalGov.Code § 53760 specifically authorizes counties in California to file a chapter 9 case. *See* Cal.Gov't Code § 53760 (West 1994). By authorizing the use of chapter 9 by its municipalities, California must accept chapter 9 in its totality; it cannot cherry pick what it likes while disregarding the rest. The right to discharge is not a benefit without burdens.

As the court in *In re City of Columbia Falls, Montana, Special Improvement Dist., No. 25*, 143 B.R. 750, 759 (Bankr.D.Mont. 1992), held in approving a chapter 9 plan of adjustment where the plan did not pay prepetition bondholders the full amount of their claim with interest in contravention of state law, "to create a federal statute based upon a theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of the view of this Court, a logical or necessary result." *Id.* (quoting *Sanitary & Improvement Dist., No. 7*, 98 B.R. at 974). The court specifically concluded that bankruptcy law supersedes the state law requiring the full payment of bondholders prepetition claims. *Id.* at 757.[21]

▮▮▮ Chapter 9 does not permit individual states to override the priority scheme that is inherent in the Code. A uniform bankruptcy code necessitates that federal law

control creditor priorities. States voluntarily agree to permit their counties to file chapter 9. *See Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1014 n. 10 (5th Cir.1985) ("State law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities."); *see also* Jackson, Bankruptcy, Non–Bankruptcy Entitlements, and the Creditors' Bargain, 91 Yale L.J. 857, 901–06 (1982). "It is equally clear that the Bankruptcy Act of 1978 explicitly defined the order of creditor priority and declared the congressional intent of federal supremacy over declared but conflicting state law." *Barrow*, 878 F.2d at 915; *see also In re Bullion Reserve*, 836 F.2d at 1214; *In re Kennedy & Cohen, Inc.*, 612 F.2d at 963; *Gulf Petroleum*, 316 F.2d at 257; *Elliott*, 356 F.2d at 749.

It is speculation at best to conclude that by not incorporating § 541 of the Code into chapter 9, Congress intended to grant to the states the authority to determine what is property of the chapter 9 debtor. Additionally, simply because Congress did not incorporate § 507(a)(2) through (a)(9) into chapter 9 does not lead to the sweeping, and potentially chaotic, conclusion that Congress intended to eliminate the federal priority scheme in chapter 9.

D. Assuming Merrill Lynch's Interpretation of Chapter 9 is Correct, § 27100.1 Would Still Conflict with Federal Bankruptcy Law, Because it Elevates the Beneficiaries of a Trust to a Position of Priority Over the Administrative Expenses of an Insolvent, Trustee Debtor.

▮▮▮ Even if Merrill Lynch's unsupported interpretation of chapter 9 was correct, Cal. Gov.Code § 27100.1 would still be preempted by federal bankruptcy law. As noted, Merrill Lynch argues that in exempting certain provisions of the Code from chapter 9, Congress invited states to define the debtor municipality's property rights, and Congress in-

---

**21.** The court went on to note that:

Far from interfering with the ability of the state ... to control its municipalities, it is concluded ... [that the state] has affirmed that its municipalities may avail themselves of the benefits of the federal bankruptcy process, in-

cluding the modification of these sorts of debts [i.e., property rights], and such does not interfere with the power of the state ... to control a municipality or in the exercise of the political or governmental powers of such municipality. *In re City of Columbia Falls*, 143 B.R. at 760.

tentionally eliminated any priority scheme, except for § 507(a)(1).[22]

If Cal.Gov.Code § 27100.1 is applied in the manner Merrill Lynch proposes, the beneficiaries of an insolvent, trustee debtor could potentially claim all the funds of an insolvent, debtor trustee who commingled his trust assets and estate assets. This would violate § 507(a)(1) which requires that administrative expenses be paid above all other creditors. Merrill Lynch's argument regarding the reach and extent of chapter 9, even if correct, still puts § 27100.1 in direct conflict with federal bankruptcy law.

For all the reasons stated in sections II.C and II.D of this opinion, I find that § 27100.1 conflicts with the supremacy clause and federal bankruptcy law.

E. Plaintiffs Have Pled Sufficient Facts in the Complaint to Allege that Merrill Lynch Asserted an Informal Proof of Claim Against Property of the County.

 Merrill Lynch also argues that it never asserted a proof of claim against the County; therefore, the Claims and Counterclaims that the County asserted in the Complaint must be dismissed. Mot.Dismiss Second Am.Compl. at 21–22. Plaintiffs respond that:

> the Complaint properly alleges Merrill Lynch's two informal proofs of claim against the County: (1) Merrill Lynch's December 15, 1994 letter to the County asserting that the County owed various debts to Merrill Lynch based on the County's full recourse undertakings and asserting that Merrill Lynch intended to obtain satisfaction of these obligations, at least in part, from the proceeds of the disputed securities, and (2) Merrill Lynch's subsequent seizure of the liquidation proceeds to satisfy the County's purported obligations.

Pls.' Opp'n Mot.Dismiss Second Am.Compl. at 22.

When viewing the allegations in the Complaint in a light most favorable to the plaintiffs, *Fresher*, 846 F.2d at 46, Plaintiffs have asserted enough facts, which if true, would show that Merrill Lynch asserted an informal proof of claim against the County.

Merrill Lynch states that "[t]he case law universally holds that a party may not challenge the allowability of a claim unless and until a claim is actually filed." Mot.Dismiss Second Am.Compl. at 21. However, Ninth Circuit law does not support this assertion. In *Sambo's Restaurants, Inc. v. Wheeler (In re Sambo's Restaurant)*, 754 F.2d 811, 816 (1985), the Ninth Circuit held that a letter to a debtor/trustee "was a sufficient informal proof of claim, amendable after the bar date, because it was intended to and did set out a claim against the estate.... [A]n informal proof of claim need not appear on the bankruptcy court's record or in its files." *Id.* (construing *County of Napa v. Franciscan Vineyards*, 597 F.2d 181, 182–83 (9th Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 598 (1980)); *see also Anderson–Walker Indus., Inc. v. Lafayette Metals, Inc. (In re Anderson–Walker Indus.)*, 798 F.2d 1285, 1287–88 (9th Cir.1986); *In re B.C. Enter., Ltd.*, 160 B.R. 827, 832 (Bankr.D.Ariz.1993).

The parties disagree as to whether the Letter states an explicit demand showing the nature and amount of the claim against the estate and evidences an intent to hold the debtor liable; however, I need not determine the issue at this time. Because the allegations in the Complaint must be treated as true,[23] Plaintiffs have pled successfully that Merrill Lynch asserted an informal proof of claim against the County in the Letter.

Because the Complaint successfully alleges that the securities, or proceeds thereof, in Merrill Lynch's possession were property of the County, the Complaint also sufficiently

---

22. Section 507(a)(1) is incorporated into chapter 9 by Bankruptcy Code § 901. Merrill Lynch argues that it is the one priority scheme that applies among creditors in a chapter 9. Reply Mem.Supp.Mot.Dismiss Second Am.Compl. at 6.

23. Allegations in the Complaint must be treated as true. *Western Reserve Oil*, 765 F.2d at 1430. A motion to dismiss should not be granted unless "it appears beyond doubt that plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Love*, 915 F.2d at 1245.

alleges that the self-help actions undertaken by Merrill Lynch constitute the assertion of an informal proof of claim against the County.

The Ninth Circuit has held that a post-petition offset of bankruptcy estate property is the functional equivalent of filing a proof of claim in the bankruptcy estate. *Sullivan v. Town & Country Home Nursing Servs., Inc. (In re Town & Country Nursing Servs., Inc.)*, 963 F.2d 1146, 1153 (9th Cir.1991); *see also United States v. Fingers*, 170 B.R. 419, 427 (S.D.Cal.1994). Assuming that the securities in Merrill Lynch's possession were County property, Merrill Lynch's liquidation of the securities and retention of the proceeds would be the functional equivalent of filing a proof of claim against the County.

III. Plaintiffs are not Judicially Estopped From Asserting Ownership to the Securities or to the Proceeds of the Sale of the Securities Held by Merrill Lynch Pursuant to the Repos.

 Merrill Lynch also argues that the County is estopped from asserting ownership to the securities or the proceeds of the securities that were in Merrill Lynch's possession, because of prior inconsistent positions that the County has taken in related litigation before this court.[24] Mot.Dismiss Second Am.Compl. at 15–19. Plaintiffs respond that the County has not taken prior inconsistent positions in the other proceedings related to this case. Pls.' Opp'n Mot.Dismiss Second Am.Compl. at 17–22.

 The doctrine of judicial estoppel is invoked to preclude a party from abusing the judicial process by taking inconsistent positions in the same litigation. *United States v. Garcia*, 37 F.3d 1359, 1366 (9th Cir.1994); *Yanez v. United States*, 989 F.2d 323, 326 (9th Cir.1993), *appeal after remand*, *Yanez v. United States*, 63 F.3d 870 (9th Cir.1995). A court invokes judicial estoppel at its discretion. *Garcia*, 37 F.3d at 1366–67.

There are two different views concerning the application of judicial estoppel in the circuit courts today.

Under the majority view, *judicial estoppel* does not apply unless the assertion inconsistent with the claim made in the subsequent litigation 'was adopted in some manner by the court in the prior litigation.' Under the minority view, *judicial estoppel* can apply even when a party was unsuccessful in asserting its position in the prior *judicial* proceeding, 'if the court determines that the alleged offending party engaged in 'fast and loose' behavior which undermined the integrity of the court.'

*Britton v. Co-op. Banking Group*, 4 F.3d 742, 744 (9th Cir.1993) (quoting *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 836 (9th Cir.1989)); *see also Garcia*, 37 F.3d at 1366–67. As the Ninth Circuit noted in *Garcia*, it has not yet adopted either view. *Garcia*, 37 F.3d at 1367.[25]

Regardless of which view of judicial estoppel is applied, the County is not estopped from asserting the allegations contained in the Complaint. The Complaint is not inconsistent with prior positions taken by the County in other litigation in this bankruptcy. In the FNMA litigation, the County argued that the FNMA debts lacked the requisite mutuality with the County debt.[26] *See In re*

---

**24.** The main proceeding that Merrill Lynch claims the County asserted a contrary position involves the County's position with respect to the offset sought by the Federal National Mortgage Association ("FNMA"). *See Fed. Nat'l Mortgage Ass'n v. County of Orange (In re County of Orange)*, 183 B.R. 609, 616–17 (Bankr.C.D.Cal. 1995).

**25.** The Sixth Circuit in examining this issue has also held that "[j]udicial estoppel will be invoked against the government when it conducts what 'appears to be a knowing assault upon the integrity of the judicial system.' ... [E]ven when invoked, [judicial estoppel] should be construed narrowly against the government...." *United*

*States v. Owens*, 54 F.3d 271, 275 (6th Cir.1995) (quoting *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 474 (6th Cir.1988)). *See also Heckler v. Community Health Servs.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984).

**26.** Under applicable law, the requisite mutuality is not present unless "[the debts subject to the offset are] due to and from the same persons in the same capacity." *Prudential Reinsurance Co. v. Superior Court*, 3 Cal.4th 1118, 1127, 14 Cal. Rptr.2d 749, 842 P.2d 48 (1992); *England v. Indus. Comm'n of Utah (In re Visiting Home Services, Inc.)*, 643 F.2d 1356, 1360 (9th Cir. 1981).

*County of Orange,* 183 B.R. at 616–17. This court ultimately held that FNMA could not satisfy the "capacity" element because the County did not own the FNMA notes individually. *Id.*

There is no inconsistency between this argument and the County's ownership allegations in the Complaint that depend on postpetition events. Prior to the bankruptcy, the County had trustee responsibilities and partial ownership interests regarding funds and securities managed by Citron. It did not have the right to treat the commingled funds and securities as its own property. The filing of bankruptcy triggered the County's right to claim ownership of the securities pursuant to Ninth Circuit law. In short, the capacities of the County regarding the ownership of the securities in the FNMA litigation and in this litigation are not the same. The County has not taken a contrary position before this court, and application of the judicial estoppel doctrine is unwarranted.

## CONCLUSION

Because the County has sufficiently pled ownership of the securities when the bankruptcy was filed and the assertion of an informal claim in the bankruptcy case by Merrill Lynch, Merrill Lynch's motion to dismiss the Claims and the Counterclaims is denied.

This memorandum opinion shall supplement my findings of facts and conclusions of law stated on the record on December 1, 1995 in support of my Order Denying Motion of Merrill Lynch to Dismiss the County and Moorlach's Second Amended Complaint.